The PEOPLE of the State of
Colorado, Petitioner,

v.

Michael BRANCH, Respondent.

No. 89SC461.

Supreme Court of Colorado,
En Banc.

Jan. 28, 1991.

Rehearing Denied Feb. 19, 1991.

Gale A. Norton, Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Hope P. McGowan, Asst. Atty. Gen., Cheryl A. Linden, Asst. Atty. Gen., Denver, for petitioner.

David F. Vela, State Public Defender, Janet Fullmer Youtz, Deputy State Public Defender, Denver, for respondent.

Justice QUINN delivered the Opinion of the Court.

We granted the People's petition for certiorari to review the decision of the court of appeals in *People v. Branch,* 786 P.2d 441 (Colo.App.1989), which reversed the conviction of the defendant, Michael Branch, for second-degree murder and remanded the case to the trial court for a new trial. In reaching this result, the court of appeals held that the trial court erred in ruling that the defendant's statements to a court-appointed psychiatrist during a competency examination were voluntary and hence were admissible to impeach the defendant's testimony at trial. In contrast to the trial court's ruling, the court of appeals concluded that the defendant's statements were obtained in violation of his right to counsel and, on that basis, were involuntary and could not be used for any purpose at trial. We conclude that the court of appeals, and also the trial court, applied an incorrect standard in resolving the voluntariness of the defendant's statements. We accordingly reverse the judgment of the court of appeals and remand the case to that court with directions to return the case to the trial court for further proceedings consistent with the views herein expressed.

I.

The defendant was charged by information with the first-degree murder of his wife, Linda Dean Branch, sometime between September 16 and September 18, 1985, in Denver, Colorado. The information was filed in the district court in October 1985, and the case was continued at the defendant's request for the entry of an attorney. On December 16, 1985, the court was advised that the defendant's parents, who lived in Chicago, had retained a Chicago attorney, and the case was continued to January 13, 1986, for the attorney's entry of an appearance. The out-of-state attorney entered an appearance on that date, and the court ordered that he associate himself with a member of the Colorado Bar, *see* C.R.C.P. 221, and continued the case to March 3, 1986, for that purpose. On March 3, the Chicago attorney did not appear and the court, with the defendant's consent, continued the case for thirty days.

During the defendant's appearance in court on March 3, he requested permission to speak to the court in chambers. The court granted this request and met with the defendant in the presence of the court reporter and a deputy sheriff. The defendant informed the court that he was concerned about his mental and emotional state and needed some help. When asked if he could cooperate with his attorney, the defendant gave a somewhat rambling and unresponsive answer, at which time the court indicated that it was going to order a competency evaluation. The court explained to the defendant that "[i]ncompetency means you may be in such an emotional state that you can't cooperate and participate with your lawyer." The court then told the defendant that the doctor examining him might be able to provide some help and stated, "We will have somebody take care of you." Although the court advised the defendant that a copy of the doctor's report would be given to the court and defense counsel, the court did not inform the defendant that the prosecution would also receive a copy of the report. The court also failed to advise the defendant of his privilege against self-incrimination during the competency examination and his right to confer with counsel prior to the examination. The court appointed Doctor Kathy Morall, a forensic psychiatrist, to conduct a competency examination of the defendant at the county jail.

Subsequent to appointing Doctor Morall, the court on March 25, 1986, entered an order to the effect that if the out-of-state attorney did not associate with local counsel by April 2, 1986, the court would remove him from the case. When the defendant appeared on April 2 without an attorney, the court discharged the out-of-state attorney from the case and appointed the public defender to represent the defendant. The court continued the case until April 25, 1986, for the filing of Doctor Morall's report of the competency examination.

Doctor Morall conducted psychiatric interviews with the defendant on three occasions at the county jail. There is no indication in the record that the defendant was advised by the public defender or Doctor Morall of his constitutional rights during the competency examination. During his meeting with Doctor Morall, the defendant told the doctor that before becoming involved with Linda, the victim, he had a four-year relationship in Chicago with another woman named Renee. He told the doctor that he broke off that relationship because he was bored and was eager for a new experience and wanted someone with more motivation. Linda, as related by the defendant to the doctor, "had a half million dollars worth of checks from her cousin who was a postal inspector" and who would "bust postmen stealing checks and would keep them and give them to Linda." The defendant also described Linda as a woman who appealed "to my greed" and added that he "didn't like her because she was loud and had too many dudes over at her house." He told the doctor that he and Linda had a volatile relationship, involving "about 150 to 200 fights," and that a son, Christopher, was born to them in August 1985.

The defendant told the doctor that Linda had tried to kill their son on prior occasions and that he believed she was trying to kill him on the night of the homicide. He then stated:

> I figured she was the devil. I was asleep when she came in and I heard her say I was dead. She was just raving. I got up and went to the bathroom and she was trying to suffocate Christopher. I saw her doing this and I couldn't take it. I really thought I was dead and thought I should cut my hair if I were dead so I had the clippers in my hand. I tried to tie her up with the cord of the clippers. She was hurting the baby more and more. I ran down the hallway yelling for help, but nobody was there. I knew I couldn't get help in time. When I came back inside she was getting ready to throw Christopher out the window, so I tried to tie her up again. She was looking like the devil and wouldn't stop. I thought Christopher was dead so I had the cord around her neck and was saying, "Stop!" She was choking Christopher. I picked her up by the cord around

her neck and she dropped the baby. I was hoping she would come back to herself. I let her go and gave Christopher mouth-to-mouth. She was breathing heavy on the floor, then started jerking. I thought she was fainting. I ran out of the house with Christopher to get help but he was OK so I came back into the apartment and tried to pick Linda up and she folded back like she had no backbone and her head hit against the wall. She didn't wake up. She was dead. I didn't know what to do. I went in the bathroom and screamed. I was talking crazy too. I got Christopher ready and we drove around all night. When we came back I thought she'd be alive, but she was stiff. She was smelling like crazy the next morning and I didn't want her spirit to possess me or Christopher. I was talking to her. I wrapped her in a blue sheet and put her in the closet. I asked the lady upstairs to babysit Christopher. I left with her about twelve noon.

The defendant described to the doctor how he returned to the apartment and wrapped the victim's body in plastic and placed the body in a large box, and rented a U–Haul truck and drove to Cheyenne, Wyoming, where he stood the box "straight up in an area by itself so it would be conspicuous" and then drove back to Denver. He also told the doctor that he sent for "an old girlfriend, JoAnn, and she came in from the airport." The defendant and JoAnn then left for Chicago with Christopher, and upon his return to Denver the defendant was arrested.

Doctor Morall, in her report, concluded that the defendant presented a "hysterical personality disorder with anti-social features" and, although in need of psychiatric attention, he was legally competent to proceed to trial. The doctor filed her report with the court on April 24, 1986, and the court, based on the report, made a preliminary finding that the defendant was competent to proceed. *See* § 16–8–111(1), 8A C.R.S. (1986). Because neither the prosecution nor the defense requested a hearing on the issue of competency, the preliminary finding became a final determination of competency. *See* § 16–8–111(2), 8A C.R.S. (1986).

The case was set for trial to a jury commencing on October 6, 1986. At trial the prosecution presented evidence establishing that police officers, after discovering the victim's body in a lot behind a grocery warehouse in Cheyenne, Wyoming, were able to trace the box to the defendant in Denver, and were also able to identify a fingerprint on the plastic wrapping around the victim's body as the defendant's print. At the conclusion of the prosecution's case, the court entertained a motion by defense counsel to suppress the defendant's statements to Doctor Morall during the competency examination on the ground that such statements were involuntary. In support of the suppression motion, the defendant testified at an in-camera hearing that he believed that he would be provided with counseling and that he talked to Doctor Morall in reliance on the court's statement to him: "We will have somebody take care of you." He further testified that he was never advised prior to the examination that anything he said to the doctor could be used against him at trial and that he believed that he had no choice other than to speak to the doctor. The court denied the suppression motion, ruling that there was "no evidence that these statements were involuntary."

The defendant elected to testify in his own defense. He stated that before he met the victim, he had lived for six years with Renee, with whom he had two children. He was working for a Chicago bank as a trader in securities when he first gradually became involved in a sexual relationship with the victim. He testified that he broke up with Renee after becoming "mesmerized by Linda." He was "amazed by her charm" and the fact that she was so "sophisticated," "worldly wise," and "so much in control." Acknowledging that he made a great mistake in breaking up with Renee, he described how he left his job at the Chicago bank and moved to Colorado with Linda. Tension developed between him and Linda when he was unable to find work in Colorado at an adequate salary. He

described how the tension increased after Christopher's birth. According to the defendant, Linda often taunted the defendant with threats that she would harm or abandon the child. The defendant also stated that a few days before Linda's death he took the child to the welfare department for safekeeping and that the child was returned to him shortly before the homicide.

The defendant also on direct examination described in detail the events surrounding the strangulation death of Linda. He stated that on the night of Linda's death she had signed papers relinquishing custody of the child to the defendant and earlier in the evening had left the apartment to obtain some cocaine and had smoked it upon her return. When the defendant was in the bathroom cutting his hair, Linda said, "I hate Christopher, I want him to die, it's just you and him." Linda, according to the defendant, then said, "You want me to drop Christopher?" The defendant replied, "No." The defendant testified that Linda dropped the baby on the carpet right in front of him, and put a pillow over Christopher's face and said that she was going to kill him. The defendant then wrapped the cord of his clippers around Linda's neck, but she wouldn't let go of the baby and was "breaking toward the window." The defendant pulled on the cord around Linda's neck to get her away from the baby, and he then fell on the bed and twisted her around. Linda at this time fell back and hit her head on the wall. He administered mouth-to-mouth resuscitation to the baby and stated that he ran out of the apartment because he was afraid of the choking noises Linda was making as she lay on the floor. The defendant next described his actions in dropping the baby off at a neighbor's apartment, renting a U–Haul trailer, wrapping Linda's body in a plastic covering, and placing the body in a large furniture box he had found. He then drove to Cheyenne, where he stood the box upright in a lot behind a warehouse so that "someone could see it" and "call the police." Upon his return to Denver, he picked up the baby and went to Chicago and later returned to Denver with a woman named JoAnn, whom he described as a "friend."

On cross-examination, the prosecutor made repeated references to statements made by the defendant to Doctor Morall during the competency examination for the purpose of impeaching the defendant on several aspects of his testimony on direct examination. In order to impeach the defendant's testimony concerning his breakup with Renee and his initial opinion of Linda, the prosecutor questioned the defendant about his statement to Doctor Morall that he had lived with Renee for six years, rather than four years as he had testified on direct examination. Because the defendant testified on direct examination about the impression Linda initially made on him, the prosecutor asked him whether he had previously told Doctor Morall that Linda was loud and involved in illegal activities and appealed to his greed. In questioning the defendant about his direct testimony that he had strangled Linda in order to save the baby, the prosecutor cross-examined him about his statement to Doctor Morall that on the night of the killing he believed that Linda was the devil and that he had been cutting his hair with clippers because he believed himself to be dead. Because the defendant had testified on direct examination that he had taken the baby and ran from the apartment out of fear of the noises Linda was making, the prosecutor also questioned him about his statement to Doctor Morall that he knew Linda was dead before he left the apartment with the baby. Similarly, in order to impeach the defendant's testimony concerning his actions in disposing of Linda's body in Cheyenne, Wyoming, the prosecutor asked him whether he had told Doctor Morall that the reason he had disposed of the body was because he did not want Linda's spirit to possess him or the baby. In light of the defendant's testimony on direct examination that the woman who came with him to Colorado after Linda's death was a "friend," the prosecutor questioned him about his statement to Doctor Morall that this woman was a former "girlfriend." Finally, the prosecutor elicited from the defendant that he had only fought with Linda once during their relationship and then

questioned him about his statement to Doctor Morall that he and Linda had between 150 and 200 fights over the course of their relationship. In each instance, when the defendant was asked whether he made the particular statement to Doctor Morall, he acknowledged that he did.

The jury returned a guilty verdict to the lesser offense of murder in the second degree, and the court sentenced the defendant to a term of twenty-two years. The court of appeals reversed the defendant's conviction and ordered a new trial. It concluded that the trial court, although aware of the effort of the defendant's family to retain out-of-state counsel, made no effort to notify counsel of the competency examination and did not provide the defendant with an opportunity to confer with counsel prior to the examination. *Branch,* 786 P.2d at 443. These circumstances, in the court's view, rendered the defendant's statements to the psychiatrist during the competency evaluation involuntary and, hence, inadmissible for impeachment purposes during the trial. *Id.*[1] We granted the People's petition for certiorari to consider whether the court of appeals properly determined that the defendant's statements during the competency examination were involuntary and inadmissible for any purpose.

## II.

The decisional law of the United States Supreme Court pertaining to the admissibility of a defendant's involuntary or uncounseled statements provides the framework for our resolution of this case.[2]

### A.

■ Before a defendant's custodial confession or inculpatory statement to a governmental agent may be admitted into evidence at trial, the prosecution must establish by a preponderance of the evidence that the confession or statement was voluntarily made. *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972); *accord, Deeds v. People,* 747 P.2d 1266, 1272 (Colo.1987). A confession or inculpatory statement will not be deemed involuntary unless there is evidence of some form of coercive governmental action that plays a significant role in inducing the statement. *Colorado v. Connelly,* 479 U.S. 157, 163–67, 107 S.Ct. 515, 519–22, 93 L.Ed.2d 473 (1986). A defendant's mental condition, "by itself and apart from its relation to official coercion," does not dispose of the inquiry into constitutional voluntariness. *Id.* at 164, 107 S.Ct. at 520. For a confession or inculpatory statement to be deemed involuntary, however, there need not be evidence of physical abuse or threats directed against the defendant. Subtle forms of psychological coercion, when utilized by a governmental agent, can play a significant role in a court's inquiry into constitutional voluntariness. *Id.* Continuous questioning of a weakened or mentally disturbed person, for example, may render a custodial statement involuntary. *See Mincey v. Arizona,* 437 U.S. 385, 396–402, 98 S.Ct. 2408, 2415–2419, 57 L.Ed.2d 290 (1978); *Townsend v. Sain,* 372 U.S. 293, 307–09, 83 S.Ct. 745, 754–55, 9 L.Ed.2d 770 (1962); *Blackburn v. Alabama,* 361 U.S. 199, 207–09, 80 S.Ct. 274, 280–81, 4 L.Ed.2d 242 (1960); *People v. Freeman,* 668 P.2d 1371, 1379 (Colo.1983). The same may be said of express or implied promises to induce a statement. *Brady v. United States,* 397 U.S. 742, 753, 90 S.Ct. 1463, 1471, 25 L.Ed.2d 747 (1970); *Bram v. Unit-*

---

1. The court of appeals also held that, because the defendant's statements to Doctor Morall were involuntary, the trial court's ruling in permitting the prosecution to use the statement for impeachment purposes was a constitutional error and, under the circumstances of this case, *could not be considered harmless beyond a reasonable doubt.* We did not grant certiorari on the issue of harmless error, and we do not address it in our opinion.

2. We emphasize here that we deal in this case only with the prosecutorial use during the guilt phase of a criminal trial of the defendant's statements to a court-appointed psychiatrist during a court-ordered competency examination. Nothing in our opinion is intended to affect the admissibility of such statements at a trial on the issue raised by a plea of insanity or at a trial on the issue of the defendant's competency to proceed. *See* §§ 16–8–106 and –107, 8A C.R.S. (1986 & 1990 Supp.).

ed States, 168 U.S. 532, 542–43, 18 S.Ct. 183, 186–87, 42 L.Ed. 568 (1897); see People v. Sparks, 748 P.2d 795, 797 (Colo. 1988); People v. Pineda, 182 Colo. 385, 387, 513 P.2d 452, 453 (1973).

■ The voluntariness of a statement must be determined by considering the totality of circumstances under which the statement was made. Mincey, 437 U.S. at 401, 98 S.Ct. at 2418; People v. Smith, 716 P.2d 1115, 1119 (Colo.1986); People v. Raffaelli, 647 P.2d 230, 235 (Colo.1982). In addition to the defendant's mental condition and any express or implied promises that might have been made to him, other factors bearing on the issue of voluntariness, although not necessarily determinative of that issue, include whether or not the defendant was adequately advised of his privilege against self-incrimination and his right to confer with counsel before making a statement. Raffaelli, 647 P.2d at 235. Also of significance is whether the defendant's inculpatory statement was made after the initiation of formal judicial proceedings against him. Once a criminal prosecution is initiated, a defendant has the right "to rely on counsel as the 'medium' between him and the State," see Maine v. Moulton, 474 U.S. 159, 176, 106 S.Ct. 477, 487, 88 L.Ed.2d 481 (1985), and to avail himself of counsel's advice with respect to matters bearing on the criminal prosecution.

■ The prosecution may not use a defendant's involuntary statement for any purpose at trial. Mincey, 437 U.S. at 398, 98 S.Ct. at 2416; New Jersey v. Portash, 440 U.S. 450, 459, 99 S.Ct. 1292, 1297, 59 L.Ed.2d 501 (1979). If, however, a statement is constitutionally voluntary—that is, there is no evidence of coercive governmental action in obtaining the statement—but nonetheless has been obtained in violation of procedural safeguards designed to ensure protection of the defendant's privilege against self-incrimination and his right to effective assistance of counsel, the statement may not be used by the prosecution as substantive evidence in its case-in-chief but may be used to impeach the defendant's testimony at trial. Michigan v.

Harvey, —— U.S. ——, 110 S.Ct. 1176, 1180, 108 L.Ed.2d 293 (1990); Harris v. New York, 401 U.S. 222, 224–26, 91 S.Ct. 643, 645–46, 28 L.Ed.2d 1 (1971). The rationale for this rule of limited admissibility is that "the 'search for truth in a criminal case' outweighs the 'speculative possibility' that exclusion of evidence might deter future violations of rules not compelled directly by the Constitution in the first place." Harvey, 110 S.Ct. at 1181 (citing Oregon v. Hass, 420 U.S. 714, 722–23, 95 S.Ct. 1215, 1220–21, 43 L.Ed.2d 570 (1975)). In order to qualify as proper impeachment evidence, the defendant's statements must be inconsistent with testimony given by him at trial. See United States v. Havens, 446 U.S. 620, 627–28, 100 S.Ct. 1912, 1916–17, 64 L.Ed.2d 559 (1980); LeMasters v. People, 678 P.2d 538, 542–543 (Colo.1984).

B.

The Supreme Court's decision in Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), provides the controlling rationale for resolving the voluntariness issue in the context of a defendant's inculpatory statements made to a court-appointed psychiatrist during a court-ordered competency examination. Smith was indicted for capital murder, and the trial court early in the case ordered a competency examination without advising Smith of his right to refuse to answer questions during the examination. During the penalty phase of the trial, the court admitted into evidence the defendant's detailed description of the crime elicited by the court-appointed psychiatrist during the competency examination. In holding that the admission of such statements violated the defendant's Fifth Amendment privilege against self-incrimination, the Court stated:

The considerations calling for the accused to be warned prior to custodial interrogation apply with no less force to the pretrial psychiatric examination at issue here. [Smith] was in custody at the Dallas County Jail when the examination was ordered and when it was conducted. That [Smith] was questioned by a psychiatrist designated by the trial

court to conduct a neutral competency examination, rather than by a police officer, government informant, or prosecuting attorney, is immaterial. When [the psychiatrist] went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of [Smith's] future dangerousness, his role changed and became essentially like that of an agent of the State, recounting unwarned statements made in a postarrest custodial setting.

During the psychiatric evaluation, [Smith] assuredly was "faced with a phase of the adversary system" and was "not in the presence of [a] perso[n] acting solely in his interests." [*Miranda v. Arizona*, 384 U.S. 436, 469, 86 S.Ct. 1602, 1625, 16 L.Ed.2d 694 (1966)]. Yet he was given no indication that the compulsory examination would be used to gather evidence necessary to decide whether, if convicted, he should be sentenced to death. He was not informed that, accordingly, he had a constitutional right not to answer the questions put to him. 451 U.S. at 467, 101 S.Ct. at 1875. The Court also held that the examination violated Smith's Sixth Amendment right to counsel, noting that a person in that position may not be aware of the scope, nuances, and boundaries of his Fifth Amendment privilege and accordingly "should not be forced to resolve such an important issue without 'the guiding hand of counsel.'" *Id.* at 471, 101 S.Ct. at 1877.

To be sure, *Smith* involved a prosecution for a capital offense, but its rationale, we believe, is equally applicable to those situations in which the trial court orders a competency examination when formal criminal charges are pending against a defendant. If a trial court is constitutionally required to employ adequate procedural safeguards to protect a defendant against the risk of making uncounseled inculpatory statements during a court-ordered competency examination before such statements may be used against him at the sentencing phase of a capital case, there is all the more reason to require a trial court to employ the same procedural safeguards in order to protect a defendant against the risk of making similarly uncounseled inculpatory statements that might be used against him at the guilt phase of a criminal prosecution.[3] Moreover, although the Supreme Court in *Smith* did not interpret the Sixth Amendment right to counsel as including the right to the presence of defense counsel during the competency examination, *Smith*, 451 U.S. at 470 n. 14, 101 S.Ct. at 1877 n. 14; *see generally People v. Larsen*, 74 Ill.2d 348, 24 Ill.Dec. 538, 385 N.E.2d 679, *cert. denied sub nom. Larsen v. Illinois*, 444 U.S. 908, 100 S.Ct. 220, 62 L.Ed.2d 143 (1979); Annotation, *Right of Accused in Criminal Prosecution to Presence of Counsel at Court–Appointed or Approved Psychiatric Examination*, 3 A.L.R. 4th 910 (1981), it clearly held that the Sixth Amendment includes the right of an accused to confer with counsel about his participation in the examination prior to the examination.

 A trial court, therefore, must provide a defendant with adequate procedural safeguards calculated to ensure protection not only of the defendant's privilege against self-incrimination in connection

---

**3.** When formal criminal charges have been filed and the defendant enters a plea of not guilty by reason of insanity, the trial court is required to advise the defendant of the effect and consequences of the insanity plea before accepting a plea. § 16–8–103(4), 8A C.R.S. (1986). One of the consequences of an insanity plea is that the prosecution may use evidence acquired directly or indirectly from any communication made by the defendant during a court-ordered insanity examination for the purpose of rebutting any evidence offered by the defendant at the guilt phase of the proceeding on his incapacity to form a culpable mental state or for the purpose

of impeaching or rebutting the defendant's testimony at the guilt phase of the proceeding. § 16–8–107(1), 8A C.R.S. (1987). Although there is no similar statutory requirement for advising the defendant of the effect and consequences of a court-ordered competency examination, we are of the view that, consistent with the defendant's Fifth and Sixth Amendment rights and as discussed in the text, a trial court should advise the defendant in similar fashion of the evidentiary consequences of statements made by him during the competency examination.

with a court-ordered competency examination but also of his right to counsel. Discharge of this responsibility requires a trial court to advise a defendant that he has the right not to say anything to the psychiatrist during the competency examination, that his statements to the psychiatrist can be used against him at the guilt phase of the trial as rebuttal or impeachment evidence, that he has the right to confer with counsel prior to submitting to the competency examination, and that the court will appoint an attorney for the defendant at state expense if the defendant is unable to retain counsel prior to the competency examination. A trial court's failure to adequately advise a defendant of his Fifth and Sixth Amendment rights and to provide him with the opportunity to confer with counsel prior to the commencement of the competency examination precludes the prosecution from using such statements as substantive evidence during its case-in-chief at the guilt phase of the trial. *See Harvey*, 110 S.Ct. at 1180; *Harris*, 401 U.S. at 224–26, 91 S.Ct. at 645–46. These same procedural deficiencies will not prohibit the prosecution from utilizing such

statements, so long as they are otherwise voluntary, either to rebut the defendant's evidence of lack of capacity to form the requisite culpable mental state or to impeach the defendant's testimony offered in defense of the charges. *See Harvey*, 110 S.Ct. at 1180; *Hass*, 420 U.S. 714, 720–24, 95 S.Ct. 1215, 1220–22, 43 L.Ed.2d 570 (1975); *Harris*, 401 U.S. at 224–26, 91 S.Ct. at 645–46.[4]

### III.

It is within the framework of the aforementioned standards that we must determine whether in this case the prosecution should have been permitted to use the defendant's statements to Doctor Morall during the competency examination for the purpose of impeaching the defendant's testimony at trial. We note initially that there is an obvious nexus between the impeachment evidence and the defendant's testimony on direct examination. The defendant testified on direct examination in great detail about his relationship to the victim and also about the facts and circumstances surrounding his actions prior to, at the time of,

**4.** Subsequent to its decision in *Smith*, the Supreme Court held in *Buchanan v. Kentucky*, 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987), that neither the defendant's Fifth nor Sixth Amendment right was violated when the trial court permitted the prosecution at a capital sentencing hearing to rebut the defendant's evidence of extreme emotional disturbance by presenting excerpts from a psychiatric report of a competency examination previously requested by defense counsel. Noting that the competency examination in *Smith* was not initiated by the defendant and that the defendant in that case did not attempt to introduce psychiatric evidence at the capital sentencing hearing, the Court in *Buchanan* stated that "if a defendant requests such an evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested" without violating the defendant's privilege against self-incrimination. 483 U.S. at 422–23, 107 S.Ct. at 2917–18. In rejecting Buchanan's Sixth Amendment challenge to the use of the report, the Court emphasized that the focus of resolving such a claim should be on Buchanan's consultation with counsel prior to the examination. Buchanan, the Court stated, undoubtedly had consulted with counsel before the examination and was informed "about the scope and nature of the

proceeding." 483 U.S. at 424–25, 107 S.Ct. at 2918–19. In light of the Court's prior decision in *Smith*, the Court stated that "counsel was certainly on notice that if, as appears to be the case, he intended to put on a 'mental status' defense for [Buchanan], he would have to anticipate the use of psychological evidence by the prosecution in rebuttal." 402 U.S. at 425, 107 S.Ct. at 2919.

In the instant case, the competency examination was ordered by the trial court on its own motion under circumstances where the defendant was not advised of his Fifth and Sixth Amendment rights and, as far as the record shows, had no opportunity to confer with counsel before the examination. Under these circumstances, *Smith*, rather than *Buchanan*, provides the controlling standard with respect to the trial court's obligation to provide adequate procedural safeguards calculated to protect the defendant's Fifth and Sixth Amendment rights during a competency examination. As we discuss in the text, however, when a defendant elects to present "mental capacity" evidence or to testify in his own defense at the guilt phase of the trial, then the holdings of *Buchanan, Harvey, Hass*, and *Harris* militate in favor of permitting the prosecution to use the defendant's uncounseled but otherwise constitutionally voluntary statements as rebuttal or impeachment evidence.

and shortly after, her death. The statements utilized by the prosecution in cross-examining the defendant directly related to the defendant's testimony on direct examination and were inconsistent with that testimony in several particulars. The critical question in this case, therefore, is whether the court of appeals employed the proper legal standard in determining that the defendant's statements during the competency examination were involuntary and inadmissible for any purpose.

■ The court of appeals concluded that the trial court's failure to inform the defendant of his right to refuse to cooperate during the competency examination, along with the trial court's failure to provide the defendant with an opportunity to confer with counsel prior to submitting to the examination, rendered the defendant's statements to the court-appointed psychiatrist involuntary and inadmissible for any purpose. In so ruling, the court of appeals erroneously equated the trial court's failure to provide the defendant with adequate procedural safeguards for the exercise of his Fifth and Sixth Amendment rights with constitutional involuntariness. As we have already noted, the trial court was obliged to advise the defendant of his constitutional rights in a manner that would have allowed the defendant to protect those rights during the competency examination, and the trial court's failure to do so was an appropriate factor in determining the voluntariness of the defendant's statements to the psychiatrist. This factor alone, however, did not inexorably render the defendant's statements the product of coercive governmental action and hence involuntary as a matter of law. *See Connelly,* 479 U.S. at 164, 107 S.Ct. at 520.

If the defendant's statements to Doctor Morall were not the result of governmental conduct that can be characterized as "coercive," but rather were knowingly and freely made, the trial court's failure to employ adequate procedural safeguards to protect the defendant's constitutional rights during the examination would render the defendant's statements inadmissible during the prosecution's case-in-chief but admissible

for the purpose of impeaching the defendant's testimony at trial. *See Harvey,* 110 S.Ct. at 1180; *Hass,* 420 U.S. at 720–24, 95 S.Ct. at 1220–22; *Harris,* 401 U.S. at 224–26, 91 S.Ct. at 645–46. The court of appeals, therefore, erred in holding that, solely because the trial court did not employ adequate procedural safeguards, the defendant's statements to the doctor were involuntary and hence inadmissible for any purpose at trial.

■ Our determination that the court of appeals erred in applying an incorrect standard of voluntariness does not result in a reinstatement of the judgment of conviction. In ruling that the defendant's statements were voluntary and hence admissible for impeachment purposes, the trial court focused exclusively on the fact that there was no evidence of any duress or coercion applied against the defendant during the competency examination. The trial court, however, failed to consider or give any weight to such factors as the defendant's mental condition preceding and during the examination, the defendant's alleged reliance on what he construed as an implied promise by the court to obtain "help" for him, and the court's failure to advise the defendant of his constitutional rights and to provide him with an opportunity to confer with counsel prior to the examination. These factors were part of the totality of circumstances surrounding the defendant's statements to Doctor Morall and should have been considered by the trial court in its resolution of the defendant's suppression motion.

A remand of this case to the trial court is necessary. If the trial court, on remand, determines that the defendant's statements to Doctor Morall were the product of coercive governmental action and were not voluntary, then the trial court should grant a new trial on the basis that such statements should not have been admitted in the prior trial for any purpose. If, on the other hand, the trial court determines that the defendant's statements, although obtained without adequate procedural safeguards designed to ensure protection of the defendant's Fifth and Sixth Amendment rights,

were nonetheless voluntary and were not induced by coercive governmental action, then the trial court should reinstate the judgment of conviction and the sentence on the basis that such statements were properly utilized by the prosecution for impeachment purposes in the prior trial.

The judgment of the court of appeals is accordingly reversed and the case is remanded to that court with directions to return the case to the trial court for further proceedings consistent with the views herein expressed.