The PEOPLE of the State of Colorado,
Plaintiff–Appellant,

v.

Marla DRACON, Defendant–Appellee.

No. 94SA238.

Supreme Court of Colorado,
En Banc.

Nov. 15, 1994.

A. William Ritter, Jr., Dist. Atty., Second Judicial Dist., Nathan B. Coats, Chief Appellate Deputy Dist. Atty., Denver, for plaintiff-appellant.

DiManna & Jackson, Michael F. DiManna, Daniel A. Sweetser, Denver, for defendant-appellee.

Justice VOLLACK delivered the Opinion of the Court.

The prosecution brought this interlocutory appeal pursuant to C.A.R. 4.1 and section 16–12–102(2), 8A C.R.S. (1986 & 1993 Supp.), to challenge an order entered by the Denver District Court suppressing all statements made by the defendant, Marla Dracon (Dracon), in response to a custodial interrogation by police officers. The district court held that the failure of the police officers to issue a *Miranda*[1] warning made their initial interrogation illegal, and that the post-*Miranda* interrogation was the product of the initial illegal interrogation. We affirm the suppression order in part, reverse in part, and remand the case to the district court for further proceedings consistent with this opinion.

## I.

Dracon was charged in the Denver District Court with child abuse resulting in the death of an eight-year-old child in violation of section 18–6–401(7)(a)(I), 8B C.R.S. (1986). Dracon filed a motion to suppress the state-ments she had made to the police during the custodial interrogations.

The district court conducted a suppression hearing in which the district court heard testimony from Officer Randall Smith of the Denver Police Department, Sergeant Doug Hildebrant of the Homicide Unit of the Denver Police Department, and from Detective Steven Luis Antuna of the Homicide Unit of the Denver District Attorney's Office. The following facts were established.

On September 2, 1993, Sergeant Bridges of the Denver Police Department arrived at the home of Allen Spencer to investigate the circumstances surrounding the death of a minor child, Robert Spencer. Allen Spencer, the boy's father, was taken from the residence to the police station by Sergeant Bridges where he was interrogated, and subsequently arrested.

Dracon, Allen Spencer's live-in girlfriend, was also present at the house, and Sergeant Bridges instructed Dracon to provide him with her keys to the residence.[2] Dracon agreed to accompany Officer Smith to the police station to discuss the circumstances surrounding Robert Spencer's death. During the trip to the police station, Dracon sat beside Officer Smith in the front seat of the patrol car without being handcuffed. Dracon asked several questions, and Officer Smith informed her that she would be instructed as to what would happen to her once she reached the police station. At no time did Officer Smith advise Dracon that she was free to leave, or that she was able to decline his invitation to escort her to the police station.

Officer Smith drove to the basement area of the Denver Police Department. He escorted Dracon in a freight elevator not available to the public and took her to the homicide bureau.[3] Officer Smith left Dracon alone in the homicide office waiting area,

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. Dracon had been residing at the Spencer residence since early July 1992.

3. Officer Smith testified that he parked the car in the basement level since that is the designated parking area. Officer Smith further stated that he chose the freight elevator because it is located closest to the homicide bureau.

where she was ultimately contacted by Sergeant Hildebrant.

Sergeant Hildebrant brought Dracon into his office for questioning. Sergeant Armedia Gordon was also present. Sergeant Hildebrant informed Dracon that he was a member of the Homicide Unit of the Denver Police Department and that he "needed to know what information she had" so that he could "figure out what happened." At no time either before or during the interview did the officers advise Dracon of her *Miranda* rights or tell Dracon that she was free to leave.[4] Further, at no time did either officer indicate to Dracon that she was under arrest. Conversely, Dracon neither indicated that she wanted to leave nor that she wanted to terminate the questioning.

Sergeants Hildebrant and Gordon interrogated Dracon from approximately 9:50 a.m. until 11:00 a.m. During the interrogation, Dracon made statements pertaining to the disciplinary action taken by Allen Spencer in punishing Robert Spencer's behavior. Dracon additionally made admissions regarding her knowledge that Allen Spencer paddlespanked Robert the evening preceding the death of the child.

Based upon the information obtained in the interrogation, Sergeant Hildebrant told Dracon that he wished to record her statement and explained why he thought a videotaped statement was necessary. Dracon agreed to give a videotaped statement. Sergeant Hildebrant took Dracon to the videotape room where Dracon was never advised of her *Miranda* rights. The videotaped interrogation commenced at 11:20 a.m. and concluded at 12:56 p.m. The interrogation was temporarily halted when Dracon went to the restroom unaccompanied by anyone.

After the videotaped interrogation was completed, Sergeant Hildebrant brought Dracon to the lobby area of the homicide bureau, and directed Dracon to "have a seat, ... and I'[ll] ... have someone get back ... [to you] that knows more about the investigation to let you know what's going on." Dracon remained unattended in the lobby area until Detective Antuna interviewed her.

Detective Antuna was assigned to interview witnesses and suspects concerning the suspicious death of Robert Spencer. Detective Antuna had completed his interview with Allen Spencer.[5] Detective Antuna walked out into the public hallway and spoke with Sergeant Hildebrant, who made him aware of the statements made by Dracon during the initial and videotaped interrogations.

Detective Antuna approached Dracon, identified himself to her, and asked if he could talk to her about the death of Robert Spencer. Dracon agreed. Detective Antuna escorted her into an interview room. Detective Antuna advised Dracon of her *Miranda* rights and then asked her whether she understood her rights as they were read to her. Dracon responded affirmatively and signed the written advisement form indicating that she had been advised of her rights.

The interrogation began at approximately 4:00 p.m. and lasted thirty to forty minutes. Detective Antuna did not advise Dracon that she was under arrest or that she was free to leave. After the interview was finished, Detective Antuna instructed Dracon to return to the lobby area. At that point, she was taken to her residence by a Denver police officer.[6]

At the conclusion of the hearing, the district court granted Dracon's motion to suppress all the statements Dracon had made to the officers. The district court suppressed the statements Dracon made to Sergeants Hildebrant and Gordon on the ground that the statements were made during a custodial interrogation that had not been preceded by *Miranda* warnings. Relying upon the standard enunciated by this court in *People v. Trujillo*, 784 P.2d 788 (Colo.1990), the district

4. Sergeant Hildebrant testified that, at the time of the interrogation, he was under the impression that Robert Spencer had been beaten to death by some kids. Sergeant Hildebrant additionally testified that he did not advise Dracon of her *Miranda* rights since he was unaware that she was under investigation for Robert Spencer's death.

5. Based upon that interview, Detective Antuna placed Allen Spencer under arrest.

6. The defendant was not charged with child abuse until a month after she had been interrogated at the police station.

court determined that a reasonable person in the defendant's position would have considered herself deprived of her freedom of action during the police interrogation. The district court concluded that all statements made during the interrogation with Sergeants Hildebrant and Gordon should be suppressed for all purposes since they were involuntary, and were the product of a custodial interrogation without the benefit of a prior *Miranda* warning. The district court additionally suppressed Dracon's subsequent statements to Detective Antuna, which were made after Dracon was advised of her *Miranda* rights, as the illegal product of the initial interrogation made without the benefit of a *Miranda* warning.

We hold that Dracon's statements were the product of a custodial interrogation. We further hold that Dracon's pre-*Miranda* statements were made voluntarily and can be used for impeachment purposes only. Lastly, we conclude that the district court erred in finding that Dracon's post-*Miranda* statements were tainted by the initial custodial interrogations.

## II.

The district court determined that Dracon was in custody during the interrogations with Sergeants Hildebrant and Gordon and Detective Antuna at the police station. The district court suppressed Dracon's statements to Sergeants Hildebrant and Gordon as the product of a custodial interrogation without the benefit of a *Miranda* warning. The district court further suppressed Dracon's post-*Miranda* statements to Detective Antuna as the illegal product of the initial custodial interrogations.

The People claim that the record does not support the district court's finding that Dracon was in custody during both of the inter-

rogations.[7] At the suppression hearing, the People presented evidence to support their contention that Dracon was not in custody, including that Sergeant Hildebrant considered Dracon to be a witness and not a suspect in the case; none of the officers told her that she was under arrest; the officers considered her free to be able to leave at any time; Dracon was not handcuffed at any time; Dracon sat in the front seat of the patrol car; a gun was never drawn on her; and she was left unattended in the lobby area of the homicide unit as opposed to being placed in a secure room or holding cell. The People further maintain that the fact that Dracon was not expressly told that she was under arrest or that she was free to leave was not sufficient evidence to support the conclusion that a reasonable person in her position would have considered herself deprived of her freedom in a significant way.

Under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), a defendant's statements made during the course of a custodial police interrogation are inadmissible as evidence in a criminal case unless the prosecutor establishes that the defendant was advised of certain constitutional rights and has waived those rights.[8] Before a *Miranda* advisement is required, the following two prerequisites must be satisfied: the person to whom the advisement is given must be in custody at the time of the advisement, and the statements being made by the person must be the product of a police interrogation. *People v. Haurey*, 859 P.2d 889, 893 (Colo.1993); *People v. Hamilton*, 831 P.2d 1326, 1330–31 (Colo.1992); *People v. Sharpless*, 807 P.2d 590, 591 (Colo.1991).

In determining whether an individual is in custody at the time of questioning, the relevant inquiry is whether a reasonable person in the suspect's position would consid-

---

7. The People additionally argue that the district court failed to apply the totality-of-the-circumstances standard. Although the district court does not articulate this standard, by relying on *People v. Trujillo*, 784 P.2d 788, 792 (Colo.1990), in making its custodial determination, the district court implicitly applied a totality-of-the-circumstances standard.

8. Prior to interrogating a person in police custody, a police officer is obliged to inform the person of the following rights: that the person has a right not to say anything; that anything she says can be used against her in court; that she has a right to the presence of an attorney; and that, if she cannot afford an attorney, one will be appointed for her prior to questioning, if she so desires. *Miranda*, 384 U.S. at 478–79, 86 S.Ct. at 1629–30.

er herself deprived of her freedom of action in a significant way at the time of questioning. *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984); *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977); *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612; *Haurey,* 859 P.2d at 893; *People v. La-Frankie,* 858 P.2d 702, 705 (Colo.1993). This determination is a question of fact to be resolved by the trial court after assessing the credibility of the witnesses and weighing their testimony. *LaFrankie,* 858 P.2d at 706; *Hamilton,* 831 P.2d at 1331; *Trujillo,* 784 P.2d at 792. These findings will not be reversed on appeal if they are supported by competent evidence and if the trial court applied the correct legal standard. *Haurey,* 859 P.2d at 893; *People v. Horn,* 790 P.2d 816, 819 (Colo.1990).

To determine a reasonable person's belief, a court must evaluate the totality of the circumstances under which the questioning occurred, including such factors as the following:

> The time, the place and purpose of the encounter; the persons present during the interrogation; the words spoken by the officer to the defendant; the officer's tone of voice and general demeanor; the length and mood of the interrogation; whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; the officer's response to any questions asked by the defendant; whether directions were given to the defendant during the interrogation; and the defendant's verbal or nonverbal response to such directions.

*People v. Horn,* 790 P.2d at 818 (quoting *Jones v. People,* 711 P.2d 1270, 1275–76 (Colo.1986)); *People v. Thiret,* 685 P.2d 193, 203 (Colo.1984). Under the "reasonable person" objective standard, "neither the interrogating officer's subjective state of mind nor the suspect's mental state is conclusive on the issue of whether a reasonable person in that situation would have considered the interrogation to be custodial." *Hamilton,* 831 P.2d at 1330.

The district court considered evidence bearing on the circumstances surrounding the police questioning. Based on that evidence, the court concluded that a reasonable person in the defendant's position would have considered herself deprived of her freedom of action during the police questioning. Our review of the record satisfies us that the evidence amply supports the district court's determination that Dracon was in custody. Sergeant Bridges, the officer in charge of the investigation at the scene of the homicide, instructed Dracon to provide him with her keys to the house. Dracon was then transported in a police car to the police station for questioning concerning Robert Spencer's death. At the police station, Dracon was escorted by Officer Smith into a freight elevator, not available to the public, and was brought to the homicide bureau. Sergeants Hildebrant and Gordon, from the homicide division, questioned Dracon. The questioning lasted approximately one hour and ten minutes and was conducted in Sergeant Hildebrant's office with the two sergeants and Dracon present. A videotaped interview was then conducted for approximately one hour and forty minutes. After the videotaped interview was completed, Sergeant Hildebrant brought Dracon to the lobby area of the homicide bureau and directed her to have a seat. Sergeant Hildebrant told her that he "[would] have someone get back ... [to her] that knows more about the investigation to let [her] know what's going on." Dracon remained in the lobby area for approximately three hours. At 4:00 p.m., Detective Antuna contacted Dracon. Detective Antuna questioned Dracon after advising her of her *Miranda* rights. At no time during any of the questioning was Dracon advised that she was free to leave. After Detective Antuna completed his interrogation, Dracon was driven home by a Denver police officer.

Dracon was at the police station from approximately 9:45 a.m. to 4:45 p.m. Dracon spent approximately three hours with Sergeants Hildebrant and Gordon during the initial questioning and approximately forty minutes with Detective Antuna. While it is unclear as to what Dracon did during the three-hour period in which she was left unattended in the lobby area, the record does indicate that she did not leave the police

station. The record supports the trial court's finding that Dracon was in custody.

■ We must next consider whether her custodial statements were the result of police interrogation. For purposes of *Miranda,* the term "interrogation" refers both to express questioning by a police officer, and to any words or actions on the part of the officer that he or she should know are reasonably likely to elicit an incriminating response from the defendant. *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980); *People In the Interest of J.C.,* 844 P.2d 1185, 1189 (Colo.1993); *People v. Probasco,* 795 P.2d 1330, 1332 (Colo.), *cert. denied,* 498 U.S. 999, 111 S.Ct. 558, 112 L.Ed.2d 564 (1990).

Our review of the record satisfies us that the district court's findings of fact are supported by competent evidence in the record and that the district court applied the correct legal standard in resolving the issue of custodial interrogations. The district court correctly found that Dracon was initially subjected to custodial interrogation by Sergeants Hildebrant and Gordon without the benefit of a *Miranda* warning. Accordingly, the district court properly suppressed the statements made by Dracon to Sergeants Hildebrant and Gordon during the initial interrogations.

### III.

■ The prosecution next contends that the evidence was insufficient to support the district court's determination that Dracon's statements were coerced by official overreaching and were not voluntarily made.

The district court determined that the statements Dracon made to Sergeants Hildebrant and Gordon were not voluntary. The district court stated that the prosecution failed to sustain its burden of proving that, based upon the totality of the circumstances, the statements were made voluntarily. The district court made the following findings:

a. The Defendant was in custody and was not free to leave at the time of the interrogation by Sergeant Hildebrant;

b. *Miranda* warnings were not given prior to this interrogation;

c. The Defendant did not knowingly waive her *Miranda* rights;

d. The Defendant did not have the opportunity to confer with counsel, or anyone else, prior to the interrogations made by Hildebrant;

e. Statements made by the Defendant to Sergeant Hildebrant were made during an interrogation and were not volunteered;

f. The Court has viewed the videotape of the statement made to Sergeant Hildebrant by the Defendant. The confrontational tenor of the interrogation, as well as the demeanor of Sergeant Hildebrant leave no question that the statements made by the Defendant in response thereto were not voluntary;

g. The Defendant was interrogated by Sergeant Hildebrant for a significant period of time, all of which occurred either in Sergeant Hildebrant's office, or in the videotape interrogation room located at the Denver Police Department;

h. The prosecution failed to produce any evidence as to the educational background of the Defendant, her prior experience with law enforcement, or the criminal justice system. At the time of the interrogation conducted in this case, the Defendant was 24 years old;

i. The Defendant was not advised at any time prior to or during any of the three separate interrogations that she was free to leave.

■ When the voluntariness of a defendant's statement is challenged, the prosecution must establish by a preponderance of the evidence that, under the totality of the circumstances, the statement was made voluntarily. *People v. Hutton* 831 P.2d 486, 488 (Colo.1992). A statement is involuntary if coercive police activity played a significant role in inducing the statement. *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 521, 93 L.Ed.2d 473 (1986); *Hutton,* 831 P.2d at 488; *People v. Gennings,* 808 P.2d 839, 843 (Colo.1991); *People v. Branch,* 805 P.2d 1075, 1080 (Colo.1991).

In determining the voluntariness of a statement, this court has articulated several factors to consider, including:

whether the defendant was in custody or was free to leave and was aware of his situation; whether *Miranda* warnings were given prior to any interrogation and whether the defendant understood and waived his *Miranda* rights; whether the defendant had the opportunity to confer with counsel or anyone else prior to the interrogation; whether the challenged statement was made during the course of an interrogation or instead was volunteered; whether any overt or implied threat or promise was directed to the defendant; the method and style employed by the interrogator in questioning the defendant and the length and place of the interrogation; and the defendant's mental and physical condition immediately prior to and during the interrogation, as well as his educational background, employment status, and prior experience with law enforcement and the criminal justice system.

*Gennings,* 808 P.2d at 844. The trial court order reveals that the trial court did consider the factors we articulated in *Gennings,* 808 P.2d at 844, 846, and *Branch,* 805 P.2d at 1081, in reaching its conclusion that Dracon's statements to Sergeant Hildebrant were involuntary. The trial court did not, however, indicate that it concluded that the conduct of Sergeant Hildebrant was coercive or, if coercive, played a significant role in inducing the statements. *See Branch,* 805 P.2d at 1080. Similarly, the trial court's order does not state that Dracon's will was overborne by improper state conduct. *See People v. Mendoza–Rodriguez,* 790 P.2d 810, 816 (Colo. 1990).

During the custodial interrogations, neither Sergeant Hildebrant nor Sergeant Gordon was in uniform and neither one of them displayed any weapons. The videotaped interrogation reveals that on several occasions during the approximately 100–minute interrogation Sergeant Hildebrant raised his voice, cut off Dracon's comments, demanded "yes" or "no" answers, conveyed disbelief of Dracon's statements, and employed sarcasm when asking leading questions. The videotape and the record of the suppression hearing constitute evidence supporting the trial

court's finding that the tenor of Sergeant Hildebrant's second interrogation of Dracon was confrontational.

Our review of the record and the videotaped interrogation indicates that, although Sergeant Hildebrant displayed a stern demeanor and serious tone, Dracon, for the most part, did not appear intimidated by him during the lengthy interrogation. After Sergeant Hildebrant asked a question, Dracon frequently would reflect for several moments before answering and then would answer the question. In certain instances, however, Dracon responded promptly and answered the questions in a conversational tone. Throughout the course of the videotaped interrogation, Dracon manifested a deferential demeanor. She appeared somewhat nervous at times, but was generally calm and composed. Dracon answered every question posed to her and evidenced little difficulty in understanding Sergeant Hildebrant's questions and comments.[9]

Sergeant Hildebrant did not inform Dracon that charges would be filed against her regardless of her interview responses. Conversely, Dracon did not at any time request to terminate the interrogation.

Based upon our review of the record of the interrogations, we conclude that the evidence establishes that Sergeant Hildebrant's demeanor during the videotaped interrogation of Dracon was at times confrontational, as the trial court found. However, we also conclude that the record establishes that such conduct did not play a significant role in inducing Dracon's statements. Because this is the only conclusion supported by the record, the trial court's determination that Dracon's statements were involuntary must be reversed.

We therefore conclude that, under the totality of the circumstances, Dracon's statements made during the initial custodial interrogation were voluntary. We further hold that Dracon's statements made during the initial custodial interrogation can be used to impeach Dracon's testimony at trial. *See Michigan v. Harvey,* 494 U.S. 344, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990); *Branch,* 805

---

**9.** The record reveals that Dracon was twenty-   four years old at the time of the interrogation.

P.2d at 1081 (determining that, where the evidence does not establish coercive governmental action in obtaining the statement but the statement has nonetheless been obtained in violation of procedural safeguards, the statement may not be used by the prosecution as substantive evidence in its case-in-chief but may be used to impeach the defendant's testimony at trial).

## IV.

The prosecution finally asserts that the district court erred in suppressing Dracon's post-*Miranda* statements to Detective Antuna on the ground that her statements were tainted by the involuntary statements made to Sergeants Hildebrant and Gordon. The prosecution further maintains that the district court applied an erroneous standard in making its determination that the prosecution failed to sustain its burden of showing by *clear and convincing* evidence that Dracon voluntarily waived her *Miranda* rights.

■ Statements which are both voluntary and obtained after a valid *Miranda* advisement are not automatically rendered inadmissible by pre-*Miranda* statements. *Mendoza–Rodriguez,* 790 P.2d at 814. Rather, a court must first determine whether the defendant's pre-*Miranda* statements were given voluntarily. *Id.* If they were, then the defendant's post-*Miranda* statements are admissible so long as they were voluntary. *Oregon v. Elstad,* 470 U.S. 298, 318, 105 S.Ct. 1285, 1297, 84 L.Ed.2d 222 (1985); *Hamilton,* 831 P.2d at 1333. "[T]he admissibility of [statements made subsequent to *Miranda* warnings] should turn ... solely on whether [they] are knowingly and voluntarily made." *Mendoza–Rodriguez,* 790 P.2d at 815 (quoting *Elstad,* 470 U.S. at 309, 105 S.Ct. at 1293). However, if the pre-*Miranda* statements were not made voluntarily, the defendant's post-*Miranda* statements will be admitted only if they were not tainted by the prior involuntary statements. *Mendoza–Rodriguez,* 790 P.2d at 814–15.

■ In light of our conclusion that Dracon's statements were made voluntarily during the initial custodial interrogation, coupled with Dracon's voluntary waiver of her *Mi-*randa rights, we find that the district court erred in ruling that Dracon's subsequent statements were tainted by prior involuntary statements made by Dracon to Sergeants Hildebrant and Gordon.

■ The district court additionally found that Detective Antuna advised Dracon of her *Miranda* rights prior to the interrogation but that the prosecution failed to sustain its burden of showing by clear and convincing evidence that Dracon voluntarily waived her *Miranda* rights.

■ Detective Antuna asked her whether she understood her rights as they were read to her. Detective Antuna checked each right after it was read to her. Dracon responded that she understood her rights and signed a written advisement form indicating that she had been advised of her rights. According to Detective Antuna's testimony, the record indicates that the Detective did not make any threats or promises to induce her to sign the form. The record does not support the district court's finding that Dracon did not voluntarily waive her rights after Detective Antuna gave her the *Miranda* advisement. Further, the district court imposed an incorrect clear-and-convincing burden upon the People in proving a waiver of Dracon's *Miranda* rights. *See People v. Hopkins,* 774 P.2d 849, 853 (Colo.1989) ("The prosecution's burden in establishing a valid *Miranda* waiver is to prove the waiver only by a preponderance of the evidence."). We therefore reverse the district court's suppression of the post-*Miranda* statements made to Detective Antuna.

## V.

In summary, we hold that the district court properly found that the statements to Sergeants Hildebrant and Gordon were made during custodial interrogations absent a *Miranda* warning. In our opinion, the statements were voluntarily made and are admissible for impeachment purposes only. We further hold that the trial court erred in finding that Dracon's post-*Miranda* statements were tainted by the initial custodial interrogations. We therefore reverse the district court's suppression of the post-*Mi-*

*randa* statements made to Detective Antuna. Accordingly, the trial court's ruling is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.