The PEOPLE of the State of Colorado, Petitioner–Appellant,

v.

In the Interest of T.C., Juvenile–Appellee,

And Concerning: C.C., Respondent–Appellee.

No. 95SA33.

Supreme Court of Colorado, En Banc.

June 12, 1995.

A. William Ritter, Jr., Dist. Atty., Second Judicial Dist., and Everett Engstrom, Deputy Dist. Atty., Denver, for petitioner–appellant.

Berkley Rasband, Lakewood, for juvenile-appellee.

Justice VOLLACK delivered the Opinion of the Court.

In this interlocutory appeal under C.A.R. 4.1, the People challenge an order of the juvenile court suppressing statements made by the juvenile, T.C., and also suppressing a statement made by a witness who implicated T.C. The juvenile court held that T.C.'s initial statement to the police should be suppressed because T.C. was not advised of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and because he was interrogated without the presence of a "parent, guardian, or legal or physical custodian," in violation of section 19–2–210, 8B C.R.S. (1994 Supp.). In addition, the juvenile court suppressed the witness's statement and a later inculpatory statement made by T.C., finding that they were the fruits of T.C.'s initial statement.

We agree with the juvenile court that T.C. was interrogated by the police while he was in custody, and that *Miranda* and section 19–2–210 both require suppression of T.C.'s initial statement to the police. However, we disagree that the subsequent statements made by the witness and T.C. should be suppressed as the fruits of the initial statement absent a showing that the initial statement was constitutionally infirm, i.e., that it was involuntary. We therefore affirm in part, reverse in part, and remand to the juvenile court for a determination, consistent with our opinions in *People v. Mack,* 895 P.2d 530 (Colo.1995), *People v. Sutherland,* 886 P.2d 681 (Colo.1994), and *People v. Dracon,* 884 P.2d 712 (Colo.1994), of whether T.C.'s initial statement was voluntary and whether, if involuntary, either the taint from the constitutional violation was attenuated, or an exception to the exclusionary rule otherwise applies to allow admission of the witness' statement and T.C.'s later inculpatory statement.

## I.

On October 31, 1994, T.C., a juvenile, was charged by a petition in delinquency with aggravated robbery, in violation of section 18–4–302(1)(b) and (1)(c), 8 C.R.S. (1986 & 1994 Supp.), and murder in the first degree, in violation of section 18–3–102(1)(b), 8 C.R.S. (1994 Supp.), for his alleged involvement in the death of Luis Gutierrez. At the time T.C. was charged, he was eleven years old.

On November 17, 1994, T.C. filed a motion to suppress certain statements made to the police prior to his arrest for the offenses. Specifically, T.C. claimed that the statement that he made to the police on August 28 and August 29, 1994, should be suppressed because it was a product of custodial interrogation without the benefit of a *Miranda* warning. T.C. also claimed that the statement should be suppressed because he was interrogated without the presence of a "parent, guardian, or legal or physical custodian," in violation of section 19–2–210. T.C. further claimed that since this initial statement was illegally obtained, a later statement from a witness who implicated T.C. in the crime and another inculpatory statement subsequently made by T.C. should be suppressed as the fruits of the initial statement.

The juvenile court held a suppression hearing on December 16, 1994, at which the following facts were revealed.

Late in the evening on August 28, 1994, Denver police officer Gary Pearce was notified by dispatch that there was an eleven-year-old boy at the police station who said he saw someone murdered. Officer Pearce arrived at the police headquarters in his patrol car, and met the eleven-year-old boy, T.C., and his mother in the courtyard outside of the police station.[1] Officer Pearce asked T.C. what it was that he had seen, and T.C. said, "I saw a guy get killed." Officer Pearce called for an on-call detective and escorted T.C. and his mother into the police station.[2] Once inside, Officer Pearce took T.C. and his mother up to the detectives' office and told them that a detective wanted to talk with them. Detective Robert Widmayer met with T.C. and subsequently questioned him. Another detective, Detective Calvin Hemphill,

---

1. There was evidence at the suppression hearing that T.C. and his mother were also accompanied by T.C.'s two younger siblings.

2. It was necessary for T.C. and his mother to be escorted into the police station, since the building was closed for the day.

was present during portions of T.C.'s statement to police.[3] It is unclear from the record if T.C.'s mother was present.[4]

According to Detective Widmayer's testimony at the suppression hearing, T.C. said that on the day of the homicide, he was sitting on his front porch with a friend named P.G. As they were sitting on the porch they were approached by a man whom they knew, named Leroy, who was the older brother of T.C.'s best friend. Leroy approached the two boys and suggested that they go for a walk. Leroy, T.C., and P.G. eventually ended up in a park where they approached an elderly man later identified as the victim, Gutierrez, and who, Leroy told T.C., was a friend of Leroy's father. Gutierrez was leaning up against a tree and was quite drunk. T.C. told Detective Widmayer that, when he saw Leroy interacting with Gutierrez, he did not believe that Leroy knew him at all.

Gutierrez asked Leroy and the two boys for directions to Fourteenth Street and Kalamath, at which point Leroy said, "Well, let's just walk him over there and show him how to get there." T.C. told Detective Widmayer that the group arrived in an alley, and that Leroy handed T.C. a knife and told T.C. to find out how much money Gutierrez had. T.C. said that he did not want to do it, but he took the knife, put it down behind his leg, approached Gutierrez and asked him how much money he had. The man replied, "I have two bills."

T.C. returned the knife to Leroy and told him that he did not want to be involved. T.C. then told Detective Widmayer that Leroy, who was behind Gutierrez, grabbed Gutierrez by the shoulders and threw him to the ground. As Gutierrez lay motionless on the ground, Leroy kicked him about six times in the head, searched his clothing and found a beverage can and a dime. Leroy handed these items to T.C., and T.C. started walking away towards his friend P.G. who was standing some distance away. T.C. said that he looked back and saw Leroy take the knife and stab Gutierrez three times in the chest. T.C. and P.G. then turned and ran until Leroy called out to them to stop, which they did. T.C. told Detective Widmayer that he stopped because he was both scared and afraid of Leroy. Leroy walked up to T.C. and P.G., wiped the blood off of the knife on some leaves near the alley, and told the two boys that if they said anything he would kill them. Leroy, T.C., and P.G. thereafter left the scene.

Detective Widmayer testified at the suppression hearing that he did not warn T.C. of his *Miranda* rights either before or during T.C.'s statement because he did not consider T.C. to be a suspect, but rather considered T.C. an eyewitness to the crime. He also stated that he never intended to elicit incriminating answers from T.C., and that he was merely trying to investigate the case.

After T.C. gave this statement to Detective Widmayer, T.C. accompanied Detective Hemphill in his patrol car shortly after midnight on August 29, 1994, and, at the request of Detective Hemphill, pointed out the addresses of the other individuals involved in the incident. T.C.'s mother was not present in the patrol car, and T.C. was not advised of his *Miranda* rights before making his statements.

Detective Hemphill then returned to the detectives' office with T.C. and Detective Widmayer videotaped T.C.'s statement. The videotaped interview lasted approximately forty-five minutes and concluded at about 2:00 a.m. on August 29, 1994.[5] Again, T.C.'s videotaped statement was not preceded by a *Miranda* warning, and T.C. was not accompanied by his mother during the interview.

---

3. Detective Hemphill was apparently called to the police station by Detective Widmayer because he was the detective who initially investigated the scene of the crime.

4. Detective Hemphill testified that T.C.'s mother was present during the initial interview, but Detective Widmayer testified that he, T.C., and Detective Hemphill were the only ones present.

5. It is not clear from the record how long T.C. and his mother and siblings were in the police station, although the juvenile court found that it was several hours. There was some testimony at the suppression hearing that the police kept the family at the police station because they were attempting to secure a safe house for them, in response to the mother's fear that Leroy was going to harm T.C.

At the suppression hearing, the juvenile court viewed the videotape in its entirety, and Detective Widmayer testified that the substance of T.C.'s videotaped statement was essentially the same as the earlier unrecorded interview. Despite the inculpatory content of T.C.'s statements, Detective Widmayer maintained that he did not warn T.C. of his rights because he did not suspect T.C. of any crime. On direct examination after the court viewed the videotape, Detective Widmayer testified that throughout the time he was questioned, T.C. was cooperative, and that Detective Widmayer did not place him under arrest, and never displayed his gun to T.C. However, Detective Widmayer also said that when he was questioning T.C. about his involvement in the crime and T.C. was attempting to answer, Detective Widmayer interrupted T.C. and said to him, "When I ask questions, just answer them." Additionally, after T.C. gave his videotaped statement, T.C.'s mother was called into the room and was asked to identify Leroy from a photographic lineup. After T.C.'s mother identified Leroy, T.C. spoke up, saying that, "Yes, that was the man." Detective Widmayer admitted that he admonished T.C. for speaking up like he did, saying that if he wanted to stay in the room with his mother he should "button his lip." Detective Widmayer also acknowledged that he never told T.C. that he was free to leave.

Although it is not clear from the record of the suppression hearing, the parties agree that the police, acting on T.C.'s initial statement, located T.C.'s friend P.G. and asked him to come to the police station to make a statement. According to the parties, P.G. was advised of his *Miranda* rights, and was questioned in the presence of his mother.[6] In his statement, P.G. related his version of the incident, saying that he observed T.C. "stomp" on the victim's head twenty to twenty-five times.

After the police secured P.G.'s statement, they asked T.C. to reappear at the police station to clarify his earlier statement. The police read T.C. his *Miranda* rights, and, in

the presence of his mother, confronted him with P.G.'s account of the incident. T.C. gave a second statement to the police, in which he admitted kicking the victim in the head. The police then arrested and charged T.C. for his involvement in the crime.[7]

At the conclusion of the suppression hearing, the juvenile court took the matter under advisement and on January 25, 1995, issued its order granting T.C.'s motion to suppress both of his statements and the statement of P.G. First, the juvenile court concluded that T.C., in light of his young age, was interrogated when he gave his initial statement to the police because the acts of the police officer were likely to elicit incriminating information. The juvenile court also concluded that T.C. was in custody during his interrogation. After listing the factors to be considered by the court in determining whether a defendant is in custody, the juvenile court found that a reasonable person in T.C.'s place would feel that he had no choice but to stay. The juvenile court ruled that the custodial interrogation was improper because it was not preceded by a *Miranda* warning and because, contrary to section 19–2–102, T.C. was not accompanied by his parent, or other statutorily-authorized adult during the questioning.

Additionally, the juvenile court held that the fruits of T.C.'s statement should also be suppressed. The juvenile court found that the statement given by P.G., which implicated T.C. in the crime, was the fruit of T.C.'s initial statement because, but for the initial statement, the police would not have known to contact P.G. Similarly, the juvenile court suppressed T.C.'s second statement because the court found that the police would not have had an opportunity to elicit that information from T.C. The court made no findings with respect to whether any of the statements were constitutionally voluntary. The People now appeal the ruling of the juvenile court.

## II.

The prosecution first argues that the police did not err by failing to give a *Miranda*

---

6. P.G. has not been charged.

7. The police were aware at the time that Gutierrez had died of stab wounds and blunt trauma to the head.

warning to T.C., or by failing to interview him in the presence of his mother, because T.C.'s statement was not a product of custodial interrogation. The prosecution asserts that T.C. willingly contacted the police and volunteered his statements, and that the trial court's conclusion that T.C. was in custody is not supported by competent evidence in the record.

■ Under *Miranda*, an individual who is interrogated by the police while in custody must be advised of certain rights.[8] If the defendant is either not advised of his rights, or fails to make a knowing and intelligent waiver of those rights, any statements the individual makes are generally inadmissible in a criminal case against him. *Miranda*, 384 U.S. at 479, 86 S.Ct. at 1630; *People v. Jordan*, 891 P.2d 1010, 1014 (Colo.1995). The warnings incorporated in a *Miranda* advisement have been codified in Colorado in the juvenile context, pursuant to section 19–2–210, 8B C.R.S. (1994 Supp.), with the additional requirement that the juvenile must be accompanied by his parent, guardian, or legal or physical custodian during the advisement and interrogation. *See People in the Interest of J.C.*, 844 P.2d 1185, 1189 (Colo.1993).[9]

■ The remedy for a *Miranda* violation, including a section 19–2–210 violation, is suppression of the statements obtained. However, that remedy only applies to statements made as a result of custodial interrogation. *Miranda*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966); *J.C.*, 844 P.2d at 1189 (finding that section 19–2–210, like *Miranda*, is applicable only when the juvenile is interrogated in custody).

■ For *Miranda* purposes, an interrogation includes both police questioning and words or actions "that the police should know

are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980); *Dracon*, 884 P.2d at 718. An individual is in custody if, at the time of questioning, a reasonable person in the suspect's position would consider himself deprived of freedom of action in a significant way. *Dracon*, 884 P.2d at 716–17.

■ In arriving at this determination, the trial court must consider the totality of circumstances surrounding the questioning. *Dracon*, 884 P.2d at 717. The totality of the circumstances test is also applicable to juveniles under section 19–2–210. *J.C.*, 844 P.2d at 1189. In that context, the trial court may additionally consider whether the parents were present during the interrogation, or whether they had knowledge of the interrogation. *Id.* As long as the trial court utilized the correct legal standard, and its conclusion is supported by evidence in the record, we will not reverse the decision on appeal. *Jordan*, 891 P.2d at 1015.

■ In its order, the juvenile court concluded that T.C. was interrogated by the police, because the acts of the police were likely to elicit information from him, particularly in light of his age. The juvenile court also enunciated the correct standard for determining whether T.C. was in custody at the time of his interrogation. The court concluded that the circumstances of the interrogation, including the length of the interrogation and the fact that it involved an eleven-year-old, would lead a reasonable person in T.C.'s situation to feel that "he had no choice but to stay and listen to the officer."

Although the juvenile court's findings could have been more explicit, we are satis-

---

8. The police must advise the individual that he has a right to remain silent, that any statement he makes can be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612; *Dracon*, 884 P.2d at 716 n. 8.

9. In pertinent part, § 19–2–210, 8B C.R.S. (1994 Supp.), provides:
 **Statements.** (1) No statements or admissions of a juvenile made as a result of the custodial interrogation ... shall be admissible

in evidence against such juvenile unless a parent, guardian, or legal or physical custodian of the juvenile was present at such interrogation and the juvenile and his parent, guardian, or legal or physical custodian were advised of the juvenile's right to remain silent and that any statements made may be used against him in a court of law, of his right to the presence of an attorney during such interrogation, and of his right to have counsel appointed if he so requests at the time of the interrogation....

fied from our review of the record that the court used the correct legal standard, and that it did not err when it found that T.C. was interrogated while in custody within the meaning of *Miranda* and section 19–2–210. It is also evident from the record that T.C. was not given a *Miranda* warning prior to making his incriminating statements to police, and that he was in fact never advised of his rights during his initial contact with police. Nor was T.C. questioned in the presence of his mother or other adult, as required under section 19–2–210.

Based on our review of the record, therefore, we agree with the juvenile court that T.C.'s initial statement to the police on August 28 and 29, 1994, was the product of custodial interrogation.[10] We also agree that since the interrogation was not preceded by a *Miranda* warning, and since T.C. was not accompanied by a qualifying adult during the questioning under section 19–2–210, that initial statement must be suppressed.

### III.

■ The prosecution argues in the alternative that the juvenile court erred in suppressing the later statement of P.G., another juvenile, and in suppressing a later inculpatory statement made by T.C. when he was confronted with P.G.'s statement. According to the prosecution, neither statement should have been suppressed as the fruit of T.C.'s initial statement because T.C.'s initial statement was not constitutionally involuntary.

■ We agree with the prosecution that the juvenile court should not automatically have suppressed either P.G.'s statement or T.C.'s later statement as the fruit of T.C.'s initial statement without making findings regarding the voluntariness of T.C.'s initial, pre-*Miranda* statement. Therefore, we reverse the suppression order with respect to P.G.'s statement and T.C.'s second statement and remand to the juvenile court for a deter-

mination, consistent with our recent opinions,[11] of whether T.C.'s August 28–29, 1994, statement was constitutionally voluntary. If it was voluntary, then neither of the subsequent statements should be suppressed as the fruit of the pre-*Miranda* statement. If it was involuntary, then the juvenile court must proceed to determine whether the taint of T.C.'s initial interrogation was sufficiently attenuated to nevertheless allow the admission of P.G.'s statement and T.C.'s later statement, or whether an exception to the exclusionary rule applies which would otherwise allow admission of the statements.[12]

The basis for our decision is that the fruits doctrine, as enunciated in *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), only requires suppression of the fruits of a statement obtained in violation of *Miranda* if the statement illegally obtained was constitutionally infirm, i.e., if it was involuntary. *See Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (finding that although there is a presumption of compulsion with an unwarned statement requiring suppression of that statement, the admissibility of a later, warned statement turns on whether both statements were voluntarily made).

■ In three recent cases, we have confirmed that even though a statement obtained in violation of *Miranda* must be suppressed, the admissibility of any subsequent statements made after a proper *Miranda* warning and waiver are not automatically rendered inadmissible by the previous *Miranda* violation. *Mack,* 895 P.2d at 533–34; *Sutherland,* 886 P.2d at 687–88; *Dracon,* 884 P.2d at 720. Instead, to determine the admissibility of those later statements, the court must make additional findings regarding the voluntariness of the statements involved. If the suspect's initial, suppressed statements were voluntary, then any later *Mirandized* statements are admissible as

---

10. For the purpose of this opinion, T.C.'s "initial statement" to police includes his initial interview, any statements made while in the patrol car with Detective Hemphill, and the videotaped version of T.C.'s statement recorded August 29, 1994.

11. *See People v. Mack,* 895 P.2d 530 (Colo.1995), *People v. Sutherland,* 886 P.2d 681 (Colo.1994), and *People v. Dracon,* 884 P.2d 712 (Colo.1994).

12. We assume, without deciding, that T.C.'s second inculpatory statement on September 8, 1994, was properly obtained.

long as they were knowingly and voluntarily made. *Dracon*, 884 P.2d at 720; *People v. Mendoza–Rodriguez*, 790 P.2d 810, 814–15 (Colo.1990). A statement is constitutionally voluntary "as long as some form of coercive police activity does not play a significant role in inducing the statement." *People v. Hamilton*, 831 P.2d 1326, 1332 (Colo.1992). The voluntariness determination should be made after considering the totality of the circumstances surrounding the making of the inculpatory statement. *Id.; see also People v. Gennings*, 808 P.2d 839, 844 (Colo.1991) (listing a number of factors to be considered).

 If the initial statement was not voluntary, then the subsequent statements must be suppressed unless there is a sufficient attenuation between the constitutional violation and the evidence sought to be introduced at trial so that the taint of the illegality is removed. *Dracon*, 884 P.2d at 720; *Mendoza–Rodriguez*, 790 P.2d at 814–15. Whether the taint of the constitutional violation has dissipated is determined by examining the intervening events between the violation and the evidence sought to be introduced. *People v. Briggs*, 709 P.2d 911, 917 (Colo.1985). If the intervening events have dispelled the causal link so that the offered evidence is "significantly free from contamination," then the taint of the constitutional violation has been removed. *Id.* Evidence obtained as the result of a constitutional violation also need not be suppressed if the prosecution can establish that the evidence was lawfully obtained through an independent source, or that the evidence would inevitably have been discovered. *See Briggs* at 709 P.2d at 922–24 (discussing and distinguishing these exceptions to the exclusionary rule).

Although our previous cases have dealt with whether the *suspect's* later statements should be suppressed once there has been a *Miranda* violation, we find that the same principles apply in determining whether to suppress the statement of a witness whose identity was derived from the pre-*Miranda* statement.[13]

In *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), the United States Supreme Court considered a case which is factually very similar to the statement of P.G. in this case. In *Tucker*, the defendant was arrested and interrogated without being advised of his rights. In his statement to the police, the defendant identified a friend, Henderson, who the defendant said would verify his alibi. Instead of verifying the defendant's alibi, Henderson implicated him in the crime. The defendant's motion to suppress Henderson's testimony was denied, and he was convicted. After the defendant's conviction was affirmed on appeal, the federal court granted his request for habeas corpus relief, finding that Henderson's testimony should have been suppressed because it was derived from the defendant's illegally-obtained statement.

 The Supreme Court reversed, and held that a violation of the prophylactic rule enunciated in *Miranda* did not require suppression of Henderson's testimony, since the record showed that the defendant's statement was not involuntary and therefore not obtained in violation of his constitutional privilege against self-incrimination. *Id.* at 445, 86 S.Ct. at 1612–13. The Court reasoned that the justifications for the exclusionary rule, including limiting untrustworthy evidence, had little application in this context because the testimony sought to be admitted was testimony of a third party "who was subjected to no custodial pressures." *Id.* at 449, 86 S.Ct. at 1614–15; *see also Elstad*, 470 U.S. at 308, 105 S.Ct. at 1292–93 (reaffirming *Tucker*, and extending the *Tucker* analysis to the situation in which the fruit of the *Miranda* violation is the suspect's own testimony).[14]

13. In *Briggs*, we addressed whether a witness's testimony was tainted by the police's failure to warn the defendant of his *Miranda* rights. However, in that case, the trial court found that the defendant's statement was involuntary. We therefore proceeded only to decide whether an exception to the fruits doctrine would nonetheless allow admission of the witness' testimony. *Briggs*, 709 P.2d at 916, 916 n. 8.

14. In our opinion, the principle enunciated in *Tucker Elstad*, and our recent cases—that suppression of the fruits of a pre-warned statement is not required if the statement was constitutionally voluntary—applies regardless of whether the

In this case, the juvenile court suppressed both P.G.'s statement and T.C.'s later statement on the ground that they were the fruits of T.C.'s initial statement, without making any findings regarding the voluntariness of T.C.'s initial statement to the police. In doing so, the juvenile court used the incorrect legal standard. While the prosecution urges us to find that T.C.'s statement was "implicitly" voluntary, we decline to do so. The trial court, which can weigh the testimony and observe the demeanor of the witnesses, is better suited in the first instance to make such a finding. *See Sutherland,* 886 P.2d at 688 (remanding for a determination of the voluntariness of a pre-*Miranda* statement and noting that, without such findings, our appellate function is hindered).

In making this determination, the juvenile court should consider the totality of the circumstances; a finding that the defendant was in custody is not dispositive. Other factors which we consider significant in determining the voluntariness of the initial statement include evidence that T.C. initiated the contact with police, and that he appeared cooperative when relating his version of the events to the police. The juvenile court should also consider the method and style of Detective Widmayer's questioning of T.C., whether the questioning was coercive, and if so, whether it was a significant factor in overbearing T.C.'s will.

### IV.

In conclusion, we affirm the juvenile court's ruling that T.C. was interrogated while in custody, and that his initial statement to police must be suppressed since he was neither advised of his *Miranda* rights nor was he accompanied by an appropriate adult during the questioning, as required by section 19–2–210. However, we reverse the order of the juvenile court suppressing P.G.'s statement and T.C.'s later inculpatory state-

ment as the fruits of the initial statement, and remand to the juvenile court for a determination of whether T.C.'s initial statement was constitutionally voluntary. Accordingly, we affirm in part, reverse in part, and remand to the juvenile court for proceedings consistent with this opinion.

statement was suppressed in the juvenile context as a result of a § 19–2–210 violation, or whether it was suppressed because of a failure to give a *Miranda* warning. In either situation, when the court is asked to suppress the fruits of the prewarned statement, the voluntariness of the statement is the crucial determination. Therefore, if the statement of a juvenile must be suppressed

due to a violation of § 19–2–210, the presence or absence of the juvenile's parent, guardian, or custodian is but one factor to be considered by the court in determining the voluntariness of the juvenile's statement, and, accordingly, whether the fruits of that statement must also be suppressed.