The PEOPLE of the State of Colorado,
Plaintiff–Appellant,

v.

Daniel Bernard TRUJILLO,
Defendant–Appellee.

No. 97SA12.

Supreme Court of Colorado, En Banc.

April 28, 1997.

Robert S. Grant, District Attorney, Seventeenth Judicial District, Michael J. Milne, Senior Deputy District Attorney, David R. Juarez, Deputy District Attorney, Brighton, for Plaintiff–Appellant.

David F. Vela, Colorado State Public Defender, Jaydee K. McPhetres, Deputy State Public Defender, Brighton, for Defendant–Appellee.

Justice SCOTT delivered the Opinion of the Court.

Pursuant to C.A.R. 4.1,[1] the People have filed this interlocutory appeal from a ruling in which the Adams County District Court (trial court) suppressed statements made by the defendant, Daniel B. Trujillo, during an interview conducted at the Thornton police station. During the interview, the defendant made statements before and after he was given his *Miranda* warnings.[2] The trial court suppressed the pre-*Miranda* statements after concluding the defendant had been subjected to custodial interrogation. The trial court also suppressed the post-*Miranda* statements, deeming the *Miranda* warning, once given, insufficient to purge the taint of the initial improper questioning because the *Miranda* warning "should have been given when the custodial interrogation began."

Due to the absence of findings of historical fact resolving conflicting testimony, we are unable to review the trial court's conclusion that the defendant was subjected to custodial interrogation. Thus, we vacate the trial court's ruling suppressing defendant's pre-*Miranda* statements. Regarding the defendant's post-*Miranda* statements, we conclude that because the trial court later found that all the defendant's statements were made voluntarily, as a matter of law, the trial court's ruling suppressing the post-*Miranda* statements cannot stand. Accordingly, we reverse the trial court's ruling suppressing defendant's pre- and post-*Miranda* statements, and we remand with directions that the trial court conduct further proceedings as it deems appropriate, to make findings of fact regarding whether the defendant was subjected to custodial interrogation before he was advised of his *Miranda* rights.

---

1. Under C.A.R. 4.1, the state may file an interlocutory appeal in this court from a ruling of a trial court granting a motion to suppress evidence or an extrajudicial confession or admission provided that such appeal is not taken for purposes of delay.

2. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

## I

We draw the facts of this case from the testimony of several witnesses at the motions hearing held before the trial court on January 3, 1997. The trial court heard the testimony of the defendant, the defendant's wife, Lena L. Trujillo (Mrs. Trujillo), Detective Richard A. Archer (Detective Archer) and Officer Steve Atkins (Officer Atkins) of the Thornton Police Department, and the victim's parents. While there were several conflicting statements in the testimony of the various witnesses regarding the interview, before entering its ruling, the trial court did not make any findings of fact distinguishing the materially different versions of the interview. Thus, where appropriate, certain statements of fact will be attributed to a particular witness. Unless contradicted, other facts appearing in the testimony of witnesses are accepted as true for purposes of our review.

## A

On April 27, 1996, S.D., a minor child (the victim), was spending the night at the home of adult friends of his parents. According to the testimony of the victim's parents and the investigating officer, Detective Archer, the defendant entered the bedroom where the victim was sleeping,[3] approached the victim, put his hand into the victim's pants, and touched the victim's "private parts." In response, the victim immediately left the bedroom and went to the living room, returning to the bedroom only after the defendant had left.

At approximately 5:00 p.m. on April 28, 1996, the victim told his parents what had occurred early that morning while he slept at the friends' home. The victim's parents called the police and Officer Atkins responded to the call. Officer Atkins talked to the victim and aided him in completing a handwritten report detailing the incident.

The case was assigned to Detective Archer. In May, a representative from the Adams County Department of Social Services (Social Services) visited the defendant and his wife (the Trujillos) at their home. During the visit, the representative told the Trujillos that they would hear from the detectives in approximately two weeks. By early June, however, the Trujillos had not been contacted by the Thornton Police Department. Mrs. Trujillo attempted to contact Detective Archer on several occasions. Because the Trujillos were planning to move to Florida in July, Mrs. Trujillo called Detective Archer to inquire about the investigation and to determine whether they could proceed with their plans to move.

At the request of Mrs. Trujillo, Detective Archer agreed to meet with the defendant and all agreed the meeting would take place on June 17, 1996, at the Thornton Police Department. Approximately ten minutes after the Trujillos arrived at the police station on the morning of June 17, Detective Archer greeted them and informed the defendant that the interview would only take place if the defendant wanted to talk to the police. The defendant indicated that it was his desire to meet with Detective Archer to discuss the incident. The detective then escorted the defendant through a locked door between the public area of the police station and the detectives' area. After passing through the locked door, they continued through the detectives' area into an interview room.

Detective Archer testified that he began the interview by trying to "establish a rapport with Mr. Trujillo." Once Detective Archer had obtained certain background information, including the defendant's full name and date of birth, he informed the defendant of his police background in investigating cases. Both the detective and the defendant testified that the tone of the interview at this point was conversational.[4]

3. It is unclear why the defendant was present at the friends' home on the night in question. Based on the testimony of the victim's mother, the defendant was attending a birthday party at the friends' home which the victim's family attended. When the victim's parents left the party at approximately 3:00 a.m., they left their two

youngest children asleep in one of the bedrooms. The victim's mother testified that there were four children in the bedroom: her two children, one of the friends' children, and the defendant's daughter.

4. On direct examination, defense counsel asked the defendant to "describe what the detective's

As to what followed, there are significant discrepancies between the testimony of Detective Archer and the testimony of the defendant. First, there is disagreement regarding whether the detective left the room during the interview and whether the door to the interview room was locked. When asked, "Did you ever leave the interview room?" Detective Archer testified, "Prior to the interview being concluded, I don't believe I did." The detective also stated that, although the door to the detectives' area was locked, the door to the interview room itself was not locked. Conversely, the defendant testified that Detective Archer did leave the interview room before he was given his *Miranda* advisement and before the interview was completed. In addition, the defendant testified that when the detective left the room he was told, "If you need to go to the bathroom or need anything, you're going to have to knock on the door because it is locked." Thus, the defendant, contrary to the testimony of the detective, testified that the door to the interview room was locked.

Also unresolved is the dispute in the testimony given by the defendant and Detective Archer regarding the alleged confession. Detective Archer testified that the defendant admitted, "I did it, all of it, but I don't know why." The defendant testified that he did not make such a statement,[5] rather he said, "If that's what [the victim] said," in response to the questions the detective asked pertaining to the victim's statement. The defendant testified that he only answered that way to "get closure on it" and to "move it along."

While it is undisputed that the Trujillos initiated the contact with Detective Archer and that it was on their request that the interview occurred, there is disagreement about the length of the interview. Detective Archer testified that the interview was short,

lasting for less than an hour. In contrast, the defendant and Mrs. Trujillo testified that they were at the Thornton Police Department for a much longer period of time and that the interview continued for approximately two hours.

The defendant also testified that he was relaxed during the initial portion of the interview and that he felt that he was free to leave at any time. On direct examination, defense counsel asked, "From the point that you entered the detective bureau through the first locked door, did you feel like you were free to leave?" The defendant replied, "At first, yes, when I went through the detective door." The defendant also testified that when they arrived at the interview room, Detective Archer said, "You're not arrested or anything. You know, you can leave." While the defendant testified that initially the tone was conversational, he also testified that the detective's statements were actually specific questions to which he felt pressure to answer. He also testified that once Detective Archer informed him that the door was locked and left the room, he did not feel free to leave.[6]

It is undisputed that Detective Archer presented the defendant with a *Miranda* advisement form. The defendant testified that Detective Archer presented the advisement form after he returned to the interview room; however, Detective Archer testified that he never left the interview room.

The defendant testified that after Detective Archer returned to the interview room and gave him his *Miranda* advisement, the questions became more demanding and accusatory. The defendant stated that Detective Archer discussed the "easy way" and the "hard way" to proceed with the case. The

voice was like." The defendant responded, "Calm, just normal, you know, like we were friends type thing."

5. Cross-examination of defendant:
 Q. Do you remember saying, "I did it, all of it, but I don't know why"?
 A. No, I did not say that.
 Q. You never said that?
 A. I never said that.

6. Specifically, testimony occurred as follows:

Q. And [Detective Archer's] first statement in the interview is that you were not under arrest and free to leave?
A. Yes.
Q. And at that time you felt like it was okay to leave?
A. At that time.
Q. How far into that interview did your feelings change?
A. After he left the room.

defendant testified that based on the detective's statements, he understood the "easy way" to be a promise of "probation, counseling, and [allowing the Trujillos to move] to Florida" if he was to confess and the "hard way" to involve being arrested immediately, having his kids taken away by Social Services, and being forced to take a drug to diminish his sex drive. Detective Archer, however, denied that he mentioned any drugs, but admitted that he explained to the defendant that there were "several different ways that these things occur and that an ultimate result could be prison in any case." The defendant testified that, during this portion of the interview, he was feeling "stressed out" because he believed that if he didn't confess, he would be arrested and that he would not see his family again.

The defendant testified that he understood the *Miranda* advisement when he signed it just after Detective Archer returned to the room and just before the questioning continued. He also testified that by the date of the interview, he had spoken with but had not retained an attorney. It is also undisputed that during the interview, the defendant never asked that the interview terminate. In addition, at no time during the interview or visit to the police station did the defendant request a lawyer.

### B

The defendant was charged with sexual assault on a child, pursuant to section 18–3–405, 8B C.R.S. (1996 Supp.), by information filed in the Adams County Court. At his arraignment, the defendant pleaded not guilty and the court set the matter for trial. Thereafter, the defendant filed a motion to suppress any statements or evidence obtained during the course of his interview with Detective Archer.

On January 3, 1997, after hearing testimony and argument, the trial court ruled that the defendant was "obviously in custodial interrogation." Without setting forth the factual basis for its conclusion, the court further stated that "a reasonable person in Mr. Trujillo's circumstances at the time that Detective Archer began his interrogation in the interrogation room would not believe that he was free to leave." Stating that the interview could not be anything other than custodial interrogation, the trial court granted the motion suppressing the defendant's statements. Concluding that the *Miranda* warnings should have been given before the custodial interrogation began, the trial court further ruled that the "fact that [Detective Archer] Mirandized [the defendant] after he had spent some period of time talking to him doesn't make the situation right." However, the trial court reserved ruling on whether the pre- and post-*Miranda* statements were, in fact, made voluntarily.

On January 10, 1997, the trial court ruled on the issue of voluntariness. The court found that all the defendant's "statements were made voluntarily to ... Officer Archer." The People then filed this interlocutory appeal to challenge the trial court's order suppressing the defendant's pre- and post-*Miranda* statements.

### II

◼ The prosecution argues that the trial court erred in concluding that the defendant was subjected to a custodial interrogation and thus entitled to advisement of his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), at the commencement of his interview with Detective Archer. Because the trial court did not make adequate findings of historical fact to support its determination that the defendant was in custody and thus not free to leave "at the time Detective Archer began his interrogation" in the interview room, we reverse that portion of the suppression order and remand for further findings.

The Fifth Amendment to the United States Constitution provides, "No person shall be ... compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, the Colorado Constitution provides, "No person shall be compelled to testify against himself in a criminal case...." Colo. Const. art. II, § 18. In *Miranda,* the Supreme Court relied upon the right to be free from compulsory self-incrimination to support its ruling that an accused must be informed of his rights prior to custo-

dial interrogation by police officers. Specifically, the Court held, "In order to ... permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." *Miranda*, 384 U.S. at 467, 86 S.Ct. at 1624. The Court described the warnings requirement as "fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation." *Id.* at 476, 86 S.Ct. at 1629. The Court further stated that "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." *Id.* at 478, 86 S.Ct. at 1630.

■ As a result, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444, 86 S.Ct. at 1612. Thus, before a person in custody can be interrogated, the person must be warned that he has certain rights, i.e., that he has the right to remain silent, that any statement he makes may be used as evidence against him, and that he has the right to the presence of an attorney, retained or appointed by a court. *See id.; see also People v. May*, 859 P.2d 879, 882 (Colo.1993). Both custody and interrogation must be present before the *Miranda* rules apply. *See People v. Gordon*, 738 P.2d 404, 406 (Colo.App.1987). "If a person is not in custody in the *Miranda* sense, then no warning of rights need precede an official interrogation." *People v. Denison*, 918 P.2d 1114, 1115–16 (Colo.1996).

■ The *Miranda* Court defined custodial interrogation as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *See Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612. A person is "in custody" not only when the person has been subjected to the constraints associated with a formal arrest, but also when a police interrogation is conducted under circumstances where the person interrogated has been deprived of his freedom of action in a significant way. *See People v. Hamilton*, 831 P.2d 1326, 1330 (Colo.1992).

■ The issue of custodial interrogation is essentially a factual question that requires a trial court to assess the credibility of witnesses, to weigh their testimony, and finally, to apply the correct legal standard, our totality of the circumstances test, to the facts as found by the court. *See Hamilton*, 831 P.2d at 1331; *People v. LaFrankie*, 858 P.2d 702, 706 (Colo.1993). "Our role as an appellate court is to review the record to determine whether the trial court's findings of historical fact 'are adequately supported by competent evidence and whether the court applied the correct legal standard to these findings in resolving the issue before it.'" *Hamilton*, 831 P.2d at 1331 (quoting *People v. Trujillo*, 784 P.2d 788, 792 (Colo.1990)). In the absence of specific findings of fact and conclusions of law by a trial court, our appellate review is hindered. *See People v. H.J.*, 931 P.2d 1177, 1183 (Colo.1997); *People v. Sutherland*, 886 P.2d 681, 688 (Colo.1994).

■ An objective standard applies to the issue of custody—that is, whether a reasonable person in the suspect's position would have considered himself deprived of his freedom of action in a significant way. *See Hamilton*, 831 P.2d at 1330; *see also People v. Trujillo*, 785 P.2d 1290, 1293 (Colo. 1990). Under this standard, neither the interrogating officer's subjective state of mind nor the suspect's mental state is conclusive on the issue of whether a reasonable person in that situation would have considered the interrogation to be custodial. *See Hamilton*, 831 P.2d at 1330; *Trujillo*, 785 P.2d at 1293. "Unlike a subjective test, the 'reasonable person' standard is not 'solely dependent either on the self-serving declarations of the police officers or the defendant nor does it place upon the police the burden of anticipating the frailties or idiosyncracies of every person whom they question.'" *Hamilton*, 831 P.2d at 1330 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 n. 35, 104 S.Ct. 3138, 3151 n. 35, 82 L.Ed.2d 317 (1984)); *see*

*also People v. Gennings,* 808 P.2d 839, 845 (Colo.1991); *Trujillo,* 785 P.2d at 1293.

In making the determination of whether a reasonable person in defendant's circumstances would have believed that he was free to leave the officer's presence, numerous factors must be considered. These factors include: (1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the officer to the defendant; (4) the officer's tone of voice and general demeanor; (5) the length and mood of the interrogation; (6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; (7) the officer's response to any questions asked by the defendant; (8) whether directions were given to the defendant during the interrogation; and (9) the defendant's verbal or nonverbal response to such directions. *See People v. Horn,* 790 P.2d 816, 818 (Colo.1990) (citing *People v. Thiret,* 685 P.2d 193, 203 (Colo.1984)).

None of these factors is determinative. Each should, however, be considered in turn. For instance, the location of the interrogation is one of the factors. A police interrogation at a stationhouse does not necessarily render the interrogation custodial for purposes of the *Miranda* warning. *See Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (holding that defendant, who voluntarily attended a half-hour interview at a police station and who was immediately informed that he was not under arrest, was not "in custody"); *see also Horn,* 790 P.2d at 818; *Trujillo,* 785 P.2d at 1293; *Jones v. People,* 711 P.2d 1270, 1276 (Colo.1986). To determine whether the interrogation of a citizen at a station house is custodial, the other factors must be consid-

ered. Here, because the parties do not dispute that the interview was an interrogation, we limit our review to the question of whether the interrogation was custodial in nature.[7]

Here, the trial court found that the defendant was "obviously in custodial interrogation" because, under the circumstances, "a reasonable person ... would not [have] believe[d] he was free to leave." However, the trial court did not refer to any historical facts or other bases for its finding that the interview was a custodial interrogation.

Indeed, the trial court's conclusion on custody is not supported by factual findings or the undisputed facts in the record before us.[8] On the record before us, the trial court did not resolve material factual disputes. By way of example, there are no findings as to whether the door to the interview room was locked, the actual words and the tone of the words spoken by Detective Archer to the defendant during the interview (at least as to whether the door was locked), or the length and mood of the interrogation before the trial court determined a reasonable person would not believe he was free to leave.

The record is insufficient because it contains conflicting testimony without a decisive finding by the trial court regarding whose testimony it found credible. Recently, we have remanded for further fact finding by the trial court when there existed unresolved evidentiary conflicts with respect to material facts. *See People In Interest of R.A.,* No. 96SA453 (Colo. Apr.21, 1997); *H.J.,* 931 P.2d at 1177; *People v. Turtura,* 921 P.2d 40, 44 (Colo.1996); *see also Sutherland,* 886 P.2d at 688. When findings are insufficient to support a ruling, as they are here, the suppression order cannot stand. *See People v. Dra-*

---

7. "Interrogation" under *Miranda* refers "not only to express questioning by a police officer, but also to any words or actions on the part of the officer that the officer 'should know are reasonably likely to elicit an incriminating response from the suspect.'" *Hamilton,* 831 P.2d at 1331 (quoting *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980)); *see also LaFrankie,* 858 P.2d at 705; *People v. Pierson,* 670 P.2d 770, 774 (Colo.1983).

8. Both Detective Archer and the defendant testified that the defendant initiated the contact with the police and arranged to meet Detective Archer at the police station. They also testified that upon his arrival, the defendant was informed that he was not under arrest and was free to leave. The defendant testified that he was relaxed and that the initial tone of the interview was conversational. The defendant also testified that at the beginning of the interview, after passing through the locked door to enter the detective area, he felt free to leave.

*con,* 884 P.2d 712, 717 (Colo.1994); *People v. Quezada,* 731 P.2d 730, 732–33 (Colo.1987).

 Here, we hold that the trial court ruling suppressing the pre-*Miranda* statements on the ground that Detective Archer failed to give the defendant his *Miranda* rights prior to commencing the interview cannot stand. We do so because the record before us is insufficient to conduct our appellate review of the trial court's conclusion that the interview constituted a custodial interrogation triggering *Miranda.* Where sufficient factual findings are not made in the face of conflicting testimony, we cannot resolve legal issues by making omitted factual findings because we are powerless to make factual determinations on appellate review where facts are contested. *See R.A.,* No. 96SA453, slip op. at 10; *H.J.,* 931 P.2d at 1183; *People v. MacCallum,* 925 P.2d 758, 766 (Colo.1996). While we may assume that uncontradicted statements have been accepted as true by the trial court when it has not found that the testimony of a given witness is to be "disbelieved in any respect," *People v. D.F.,* 933 P.2d 9, 11 (Colo.1997), this record does not present such a situation of uncontested testimony. Yet, the trial court, which can view the demeanor of witnesses and weigh the evidence presented, made no findings of fact based on conflicting testimony regarding custody.

Because the record contains conflicting testimony on this issue, findings of fact were essential.[9] Rather than deciding the issue here, where we only have access to a cold record, we remand to the trial court with directions to make additional findings regarding whether the interview was a custodial interrogation. *See People v. Morales,* 935 P.2d 936, 942 (Colo.1997) (remanding with directions to make additional findings on the voluntariness of consent despite the fact that "the record would appear to support a conclusion that the consent was free and voluntary"); *Sutherland,* 886 P.2d at 688 (remanding for findings on the voluntariness of statements to a police officer where the trial court failed to make any findings and failed to address the appropriate factors).

Accordingly, because the trial court's findings are insufficient for appellate review, we reverse the trial court's order suppressing the defendant's pre-*Miranda* statements and remand for further findings on this issue.

### III

 The People argue that the trial court erred in ruling that defendant's statements, after being informed of his rights under *Miranda* and waiving such rights, were the illegal product of his initial unwarned statement to Detective Archer. The People point to the trial court's failure to find that the post-*Miranda* statements were tainted by the illegal nature of the pre-*Miranda* questioning. Even if we were to determine that the pre-*Miranda* statements were obtained as the result of a custodial interrogation, the voluntary statements made after a *Miranda* warning has been given cannot constitute "fruit of the poisonous tree" when the pre-*Miranda* statements are voluntary. As such, we agree with the prosecution that the post-*Miranda* statements should not have been suppressed because the trial court did find, at the January 10, 1997, proceeding, that the defendant's pre- and post-*Miranda* statements were voluntarily made.

In *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the Supreme Court considered whether an initial failure of law enforcement officers to administer the warnings required by *Miranda,* without more, "taints" subsequent admissions made after a suspect has been fully advised of and has waived his *Miranda* rights. The Court stated:

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to

9. *See People v. Gennings,* 808 P.2d 839, 844 (Colo.1991) ("[I]t is critical that the trial court, in making its findings, expressly resolve on the record the contested factual issues."); *People v. Martinez,* 789 P.2d 420, 423 (Colo.1990) ("The court's findings of fact and conclusions of law ... lack the specificity that would enable us to make a proper determination of the constitutional issues in this case without invading the fact-finding province of the trial court.").

exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.

*Elstad*, 470 U.S. at 309, 105 S.Ct. at 1293. The Court opined that the admissibility of a statement made after *Miranda* warnings should turn solely on whether it was knowingly and voluntarily made. *See id.* In the event of an unwarned but clearly voluntary admission, the Court held, a careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible. *See id.* at 310–11, 105 S.Ct. at 1293–94. Thus, the Court held that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings. *See id.* at 318, 105 S.Ct. at 1297–98.

We adopted the reasoning of *Elstad* in *People v. Mendoza–Rodriguez*, 790 P.2d 810, 814 (Colo.1990). Like the defendant here, the defendant in *Mendoza–Rodriguez* agreed to go to the police station to discuss a crime. The police officers handcuffed the defendant, placed him in the back of their patrol car, and took him to an interview room where they removed his handcuffs. In *Mendoza–Rodriguez*, the defendant made inculpatory statements both before and after the *Miranda* advisement. We held that a statement made by the defendant before the police administer a *Miranda* warning does not automatically render subsequent voluntary Mirandized statements by the defendant inadmissible. *See id.* at 814; *see also People v. Mack*, 895 P.2d 530, 537 (Colo.1995); *People v. Sutherland*, 886 P.2d 681, 687–88 (Colo. 1994); *People v. Dracon*, 884 P.2d 712, 720 (Colo.1994). Further, we defined certain steps in the analysis of the voluntariness of post-*Miranda* statements. First, a court must determine whether the defendant's pre-*Miranda* statements were given voluntarily. *See Mendoza–Rodriguez*, 790 P.2d at 814; *Mack*, 895 P.2d at 536–37; *Dracon*, 884 P.2d at 720. If the pre-*Miranda* statements were given voluntarily, then the post-*Miranda* statements would not necessarily be rendered involuntary. *See Mendoza–Rodriguez*, 790 P.2d at 814; *Dracon*, 884 P.2d at 720. If the pre-*Miranda* statements were not made voluntarily, however, the defendant's post-*Miranda* statements could be admitted only if they were not "tainted" by the prior involuntary statements. *See Mendoza–Rodriguez*, 790 P.2d at 814–15; *Dracon*, 884 P.2d at 720.

In determining whether a defendant's statements are voluntary, a trial court must consider the totality of the circumstances surrounding the statements. *See Mendoza–Rodriguez*, 790 P.2d at 816. The burden is on the prosecution to prove by a preponderance of evidence that the statement was made voluntarily. *See id.; People v. Hopkins*, 774 P.2d 849, 853 (Colo.1989). One of the factors to be considered in determining voluntariness is the individual's state of mind. Statements are voluntary if they are the product of the individual's free and rational choice. *See Mendoza–Rodriguez*, 790 P.2d at 816.

Another factor to be considered is the actions of the police officer during the interview. In *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 521–22, 93 L.Ed.2d 473 (1986), the Supreme Court held that coercive police activity is a necessary predicate to the finding that a confession is not "voluntary." Voluntary statements are those that are not extracted by threats or violence and not obtained by direct or implied promises or the exertion of improper influence. *See Mendoza–Rodriguez*, 790 P.2d at 816.

After considering the testimony of the defendant and Detective Archer regarding the issue of voluntariness, the trial court found that all the defendant's statements to the detective, though precluded from use based on *Miranda*, were made freely and voluntarily.[10] The record supports this finding. The defendant not only voluntarily attended the interview, but the interview was arranged at the request of the defendant and

---

10. The defendant does not argue that the waiver was not valid, he simply asserts that all of his statements were involuntary.

his wife. The defendant also voluntarily signed the *Miranda* advisement form.[11] The defendant testified that before Detective Archer left the room and informed him that the door was locked, he felt free to leave. Thus, the trial court's finding that the defendant's statements were voluntary is supported by the record and therefore will not be disturbed on review.

While he testified that Detective Archer's statements about "the hard way" induced him to sign the *Miranda* advisement form because he feared losing his family, the defendant did not specifically claim that his statements to Detective Archer were involuntary. Detective Archer did not corroborate the statement about "the hard way," but he did admit to discussing what could happen to the defendant as a result of the accusation. Detective Archer testified that his statements to the defendant about the possible consequences were typical procedure and in no way promising or threatening anything.

Therefore, despite the defendant's testimony regarding his fear of losing his family, we conclude that the record supports the trial court's finding that the defendant's statements were voluntary. Detective Archer's statements about the future of the case do not rise to the level of impermissible coercion. Detective Archer did not promise the defendant anything in return for a confession, nor did he threaten the defendant with anything if he failed to confess. Thus, we accept the trial court's conclusion that the defendant voluntarily agreed with the allegations that Detective Archer read from the victim's statement.

The defendant argues that the trial court's finding of voluntariness is contradictory to its suppression of his statements. The defendant claims that by suppressing the post-*Miranda* statements, the trial court implicitly ruled that the pre-*Miranda* statements were involuntary.

There is a conflict inherent in the trial court's suppression order and voluntariness findings. Under *Elstad* and *Mendoza–Rodriguez*, if the trial court found that the defen-

dant's statements were voluntary, then the post-*Miranda* statements should not have been suppressed unless they were tainted. Since the trial court found that the pre-*Miranda* statements were voluntary, there can be no taint on the post-*Miranda* statements. We therefore hold that the trial court erred as a matter of law and that the post-*Miranda* statements should not have been suppressed.

### IV

Because the trial court failed to make sufficient findings in light of the conflicting testimony, the record does not permit our review of the trial court's conclusion that the defendant was subjected to custodial interrogation before he was advised of his *Miranda* rights. Therefore, we remand this matter to the trial court with directions that it make further findings regarding whether the defendant was subjected to a custodial interrogation prior to his *Miranda* advisement. Such findings may be made wholly on this record or after further proceedings as the trial court deems appropriate. Furthermore, based on our holding in *People v. Mendoza–Rodriguez*, the trial court's January 3, 1997, ruling suppressing the post-*Miranda* statements cannot stand as a matter of law because the trial court determined that the defendant's statements were voluntarily made.

Accordingly, the trial court's January 3, 1997, ruling suppressing pre- and post-*Miranda* statements made during the defendant's interview with Detective Archer is reversed.

VOLLACK, C.J., dissents, and
MARTINEZ, J., joins in the dissent.

Chief Justice VOLLACK dissenting:

The majority reverses the district court's suppression of all statements made by Daniel Trujillo (Trujillo) to Detective Richard Archer (Detective Archer) on June 17, 1996. The majority holds that the record does not sup-

---

**11.** The testimony surrounding the signing of the *Miranda* advisement form is sparse and it is not readily apparent from the trial court's determina- tion precisely when the advisement was given. Nonetheless, the defendant does not argue that he was forced to sign the form.

port the trial court's finding that Trujillo was under custodial interrogation prior to being advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The majority therefore remands the case to the trial court to conduct further proceedings "to make findings of fact regarding whether the defendant was subjected to custodial interrogation." Maj. op. at 3. I dissent to this part of the majority's opinion because I believe that the record supports the trial court's finding that Trujillo was subjected to a custodial interrogation before he was advised of his *Miranda* rights. As such, I would affirm the trial court's suppression of Trujillo's statements made prior to the *Miranda* advisement.

Because the statements Trujillo made before being advised of his *Miranda* rights were voluntary, however, any statements he made after being advised of his *Miranda* rights should not be suppressed.

## I.

On April 28, 1996, S.D., a ten-year-old boy, reported to his parents that he had been sexually assaulted by Trujillo while spending the previous night at the home of family friends. Specifically, S.D. reported that Trujillo had put his hand down S.D.'s pants and touched S.D.'s "private parts." S.D.'s parents reported the incident to the Thornton Police Department, and Detective Archer was assigned to investigate the matter.

On June 17, 1996, Trujillo and his wife arrived at the Thornton Police Department for a scheduled interview with Detective Archer. When they arrived at the police station, they stayed in the waiting area for approximately five to fifteen minutes. While Trujillo's wife remained in the waiting area, Detective Archer directed Trujillo through a locked door leading to the detective division of the police station. Detective Archer and Trujillo then proceeded down a hallway and through another door to a small interview room.

According to both Trujillo and Detective Archer, the tone of the interview was conversational at first, although Trujillo testified that he felt required to answer Detective Archer's questions. At the beginning of the interview, Detective Archer obtained Trujillo's background information, such as his full name and date of birth. Detective Archer also informed Trujillo of the detective's police background, particularly his investigation of cases involving sexual assault on children.

According to Trujillo, approximately fifteen minutes after the interview began, Detective Archer briefly left the room. Trujillo testified that as the detective left the room, he stated, "If you need to go to the bathroom or anything, you're going to have to knock on the door because it is locked." Trujillo also testified that the interview lasted a total of approximately two hours. According to Detective Archer, although he initially testified that he did not leave the interview room prior to the conclusion of the interview, he later conceded that he may have briefly left the interview room to obtain a *Miranda* advisement form once he determined the need to inform Trujillo of his *Miranda* rights. Additionally, Detective Archer testified that the interview with Trujillo lasted for only one hour, although he stated that Trujillo may have been at the police station for a total of two hours.

After Detective Archer returned to the interview room, he advised Trujillo of his *Miranda* rights and Trujillo signed a form indicating that he understood and waived those rights. According to Trujillo, Detective Archer discussed with him "the hard way" to proceed with the case, which involved Trujillo being arrested, having his children taken away by Social Services, and being required to take a drug which would diminish his sex drive. Trujillo further testified that Detective Archer also discussed "the easy way" to proceed, which involved Trujillo confessing to the sexual assault on S.D., being on probation, participating in counseling, and continuing with his plans to move out of Colorado. In contrast, Detective Archer testified that although he discussed with Trujillo the possible ways in which the case could develop, he did not promise or threaten Trujillo with any particular outcomes if Trujillo did or did not confess.

At the suppression hearing on January 3, 1997, the district court found that "a reason-

able person in Mr. Trujillo's circumstances at the time Detective Archer began his interrogation in the interrogation room would not believe that he was free to leave." As such, the district court concluded that Trujillo was subjected to a custodial interrogation and suppressed all statements Trujillo made prior to being advised of his *Miranda* rights.

The district court also suppressed all statements Trujillo made after being advised of his *Miranda* rights, reasoning that the *Miranda* advisement given to Trujillo "after [Detective Archer] had spent some period of time talking to him doesn't make the situation right." The district court thereafter took the issue of the voluntariness of Trujillo's statements under advisement and reserved ruling until a later date. On January 10, 1997, the district court made the following ruling regarding the voluntariness of Trujillo's statements:

> After considering the testimony of the officers as to the issue of voluntariness, the court will find that while the statements have been precluded from use because of the *Miranda* advisal, the statements were made voluntarily to ... Officer Archer and the court will find that they were voluntarily and freely made.

The prosecution subsequently filed this interlocutory appeal to determine whether the district court properly ruled that Trujillo was subjected to a custodial interrogation before being advised of his *Miranda* rights and whether the district court properly suppressed Trujillo's statements after he was advised of his *Miranda* rights.

## II.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that prosecutors may not use statements made during a custodial interrogation of a defendant unless the prosecution demonstrates that the defendant was adequately advised of his rights. *See People v. Denison*, 918 P.2d 1114, 1115 (Colo. 1996). In determining whether an individual is in custody at the time of questioning, courts must determine whether a reasonable person in the same position would consider himself deprived of his freedom of action in a significant manner. *See People v. Moore*, 900 P.2d 66, 71 (Colo.1995). To resolve this issue, courts must consider the totality of the circumstances surrounding the interrogation. *See id.* An appellate court will not disturb the trial court's findings on appeal if such findings are supported by competent evidence in the record and the trial court applied the correct legal standard. *See id.* at 71–72.

. Factors which may be considered to determine a reasonable person's belief regarding his or her freedom of action include: (1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the officer to the defendant; (4) the officer's tone of voice and general demeanor; (5) the length and mood of the interrogation; (6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; (7) the officer's response to any questions asked by the defendant; (8) whether directions were given to the defendant during the interrogation; and (9) the defendant's verbal or nonverbal response to such directions. *See People v. Dracon*, 884 P.2d 712, 717 (Colo.1994). Under the reasonable person objective standard, "neither the interrogating officer's subjective state of mind nor the suspect's mental state is conclusive on the issue of whether a reasonable person in that situation would have considered the interrogation to be custodial." *Id.* (quoting *People v. Hamilton*, 831 P.2d 1326, 1330 (Colo.1992)).

We have held that custody is not limited to those situations involving a formal arrest. *See People v. Horn*, 790 P.2d 816, 818 (Colo. 1990). Additionally, the initial voluntariness of a person's presence at a police station does not preclude the determination that his presence thereafter is custodial in nature. *See id.* Even when a defendant is repeatedly told that he is free to leave the police station and that he would not be arrested that same day, the defendant may still be found to have been subjected to a custodial interrogation. *See id.* at 818–19.

Where the trial court's factual findings lack detail but the evidence supports the trial court's conclusions, we have avoided remand-

ing the case for further factual findings by considering findings which are fairly implied by the trial court's conclusions. *See People v. Pease*, 934 P.2d 1374, 1376–77 (Colo.1997). This approach to a determination of custody for *Miranda* purposes is appropriate because custody is essentially a factual issue to be determined by the trial court. *People v. Trujillo*, 784 P.2d 788, 792 (Colo.1990).

In the current case, it is not necessary to remand the case to the trial court with directions to find facts supporting the trial court's determination of custody when the evidence both supports and predicts the findings which will be forthcoming. Although Trujillo and Detective Archer supplied conflicting testimony as to the details of the interview, the record supports the trial court's conclusion that Trujillo was subjected to a custodial interrogation on June 17, 1996. After Trujillo arrived at the police station, he was separated from his wife and directed to pass through a locked door leading to the detective division of the police station. Trujillo and Detective Archer then proceeded down a hallway and, according to Trujillo's testimony, through another locked door to reach the interview room. The two locked doors alone, viewed from the objective perspective of a reasonable person, supports the conclusion that a reasonable person would have considered himself deprived of his freedom of action in a significant manner. Moreover, the fact that Detective Archer later left Trujillo in the locked interview room also supports the conclusion that Trujillo was subjected to a custodial interrogation once he entered the interview room. The totality of the circumstances thus objectively indicates that Trujillo's freedom of movement was limited during the interrogation at the police station on June 17, 1996.

Although the district court did not make explicit factual findings, the record supports the district court's conclusion that "a reasonable person in Mr. Trujillo's circumstances at the time Detective Archer began his interrogation in the interrogation room would not believe that he was free to leave" and that Trujillo was thus subjected to a custodial interrogation. Because the district court's conclusion is supported by competent evidence in the record, I believe that this case need not be remanded for factual findings regarding the issue of custodial interrogation.

## III.

The district court also suppressed all statements Trujillo made after being advised of his *Miranda* rights, reasoning that the *Miranda* advisement given to Trujillo "after [Detective Archer] had spent some period of time talking to him doesn't make the situation right."

In *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the United States Supreme Court considered whether a law enforcement officer's initial failure to administer a *Miranda* advisement tainted subsequent admissions which a suspect made after being fully advised of his *Miranda* rights, which he waived. In *Elstad*, the suspect was arrested at his home on a charge of burglary, but was not advised of his *Miranda* rights at that time. The arresting officer told the suspect that he believed the suspect was involved in the burglary. The suspect replied to the officer's remark by stating, "Yes, I was there." The suspect was then transported to the police station where he was advised of his *Miranda* rights for the first time. After the *Miranda* advisement, the suspect agreed to talk to the police and made a statement detailing his involvement in the burglary.

The Supreme Court held that the Fifth Amendment of the United States Constitution does not require the suppression of a confession made after a proper *Miranda* advisement and waiver. *Id.* at 318, 105 S.Ct. at 1297–98. The Court stated that a suspect's answers during a custodial interrogation in the absence of the required *Miranda* advisement must be excluded from evidence at trial. *Id.* at 317, 105 S.Ct. at 1297. However, the Court determined that there was little justification for excluding evidence of a subsequent voluntary confession made after being advised of *Miranda* rights when neither the suspect's initial incriminating statement nor his subsequent confession is coerced. *Id.* at 312, 105 S.Ct. at 1294–95. The Court reasoned that "there is no warrant for pre-

suming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made." *Id.* at 318, 105 S.Ct. at 1297–98.

In *People v. Mendoza–Rodriguez,* 790 P.2d 810 (Colo.1990), Colorado adopted the reasoning in *Elstad* under circumstances similar to those of the current case. In *Mendoza–Rodriguez,* the defendant was handcuffed, transported to the police station, placed in an interview room, and questioned for approximately fifteen to twenty minutes prior to being properly advised of his *Miranda* rights. After the *Miranda* advisement, the defendant made additional inculpatory statements. This court ruled in *Mendoza–Rodriguez:*

> [A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.

*Id.* at 814 (quoting *Elstad,* 470 U.S. at 314, 105 S.Ct. at 1296). This court held that in order to determine the voluntariness of post-*Miranda* statements, a court must first determine whether the defendant's pre-*Miranda* statements were given voluntarily. *Id.* If the pre-*Miranda* statements were voluntary, then the post-*Miranda* statements would not be rendered involuntary. *Id.* This court thus concluded that the officers' initial failure to advise the defendant of his *Miranda* rights did not necessarily impermissibly taint his subsequent post-*Miranda* statements. *Id.* at 815.

In the current case, after Detective Archer returned to the interview room, he advised Trujillo of his *Miranda* rights and Trujillo signed a form indicating that he understood and waived those rights. The district court specifically found that Trujillo's pre-*Miranda* statements were voluntary. In accordance with this court's holding in *Mendoza–Rodriguez,* because Trujillo's pre-*Miranda* statements were found to be voluntary, his post-*Miranda* statements are not rendered involuntary. As such, although Trujillo's pre-*Miranda* statements should be suppressed because he was subjected to a custodial interrogation, his post-*Miranda* statements should be admitted because they were voluntary and not tainted by Detective Archer's initial failure to advise him of his *Miranda* rights.

### IV.

In my view, the record supports the district court's conclusion that Trujillo was subjected to a custodial interrogation throughout his interview with Detective Archer on June 17, 1996. Therefore, I would affirm the district court's suppression of Trujillo's statements prior to being advised of his *Miranda* rights. Because the statements Trujillo made before being advised of his *Miranda* rights were voluntary, however, any statements he made after being advised of his *Miranda* rights should not be suppressed. Thus, I would affirm in part and reverse in part.

I am authorized to say that Justice MARTINEZ joins in this dissent.