The PEOPLE of the State of Colorado,
Plaintiff–Appellant

v.

David Allison BECKER,
Defendant–Appellee.

No. 08SA235.

Supreme Court of Colorado,
En Banc.

Nov. 24, 2008.

Bill Thiebaut, District Attorney, Tenth Judicial District, Richard W. Dickerson, Deputy District Attorney Pueblo, Colorado, Attorneys for Plaintiff–Appellant.

Buxman Kwitek & Ohlsen, P.C., Karl S. Tameler, Pueblo, Colorado, Attorney for Defendant–Appellee.

Justice RICE delivered the Opinion of the Court.

In this interlocutory appeal taken pursuant to C.A.R. 4.1, we review an order from the Pueblo County District Court suppressing statements the defendant made in response to police interrogation. We find that the trial court erred in suppressing those statements because the defendant was not in custody at the time the statements were made. We therefore reverse the trial court's suppression order and remand for further proceedings.

## I. Facts and Procedural History

On April 27, 2006, Narcotics Detective Leide DeFusco of the City of Pueblo Police

Department was contacted by Albertson's pharmacy with a report of an apparently altered prescription. The pharmacist, Anthony Blackmoore, told DeFusco that the defendant, David Allison Becker, had attempted to fill a prescription shortly before the pharmacy closed that day. Blackmoore informed Becker that he could not fill the prescription until he verified its authenticity with the prescribing doctor. Blackmoore suspected that the prescription had been altered because it contained both a prescription for Ativan, a schedule IV controlled substance, and one for Adderall, a schedule II controlled substance. Blackmoore was aware that federal law mandates that when a schedule II controlled substance is prescribed, nothing else may accompany it on the same prescription.

The following morning, another Albertson's pharmacist, Laura Fossceco, called the prescribing doctor, Dr. Wofford. After Fossceco faxed Wofford's office a copy of the apparently forged prescription, the office confirmed that the original prescription had indeed been altered. Dr. Wofford later informed DeFusco that he had prescribed only Ativan, and not Adderall, for Becker.

Fossceco then contacted DeFusco and informed him that the prescription was in fact altered. DeFusco instructed her to fill the prescription with five Adderall pills and five Ativan pills, and to wait until he arrived at the pharmacy to give the pills to Becker. She followed those instructions, and after Becker purchased the pills, DeFusco confronted him. DeFusco, dressed in plain clothes and carrying a concealed weapon, informed Becker that he was a police officer, showed him his badge, and told him they needed to talk about a possibly altered prescription. Becker told DeFusco that his doctor had prescribed the Adderall. DeFusco then seized Becker's prescription bag and the two of them entered an employee lounge in the store to discuss the prescription.

DeFusco informed Becker that he was not under arrest and that he would not be arrested. DeFusco also told Becker that he would not likely spend any time in jail—something he tells most suspects based on their criminal histories. However, he did not read Becker his *Miranda* rights. Becker asked if his wife could be present during the interrogation, and DeFusco approved. DeFusco testified that he accompanied Becker out into the store, standing "more than an arm's length" from Becker while he located his wife. All three then returned to the employee lounge to discuss the prescription.

DeFusco testified that the lounge was a separate room that did not have a door on it. There was a rectangular table near the entryway to the lounge. Becker and his wife were sitting next to each other at the table, and DeFusco was moving around the room throughout the interview. DeFusco testified that he stood facing the entryway, avoiding having his back to the entryway because he "didn't want to give the appearance that [Becker] wasn't free to leave because he was free to leave." A couple of employees entered the lounge during the interview, and DeFusco asked them to leave.

DeFusco again explained why he was called to the pharmacy and asked Becker why he added the Adderall to the prescription. When confronted with the double prescription, each prescription having been written in different handwriting, Becker admitted that he added the prescription for Adderall to the original prescription for Ativan. Becker then accused the prescribing doctor, Dr. Wofford, of being "a pill doctor" who "gives [pills] out to anyone." He told DeFusco that Dr. Wofford came to see him while he was in the hospital in February 2006, and Wofford issued the Ativan prescription at that time. Becker told DeFusco that he altered the prescription, adding Adderall, while he was still in the hospital. When asked why he forged the prescription in February but waited until April to have the prescription filled, Becker said he did not need the pills until April.

At that point, the interview concluded. DeFusco gave Becker his name and phone number and informed him that he would write up a report and send it to the District Attorney's office. DeFusco testified that the interview lasted approximately twenty minutes and that he did not raise his voice or become angry at any time. Likewise, Becker's wife testified that the tone of the entire

conversation was civil. However, she also testified that she never heard DeFusco tell her husband that he was not under arrest, she thought he was under arrest, and she was surprised when he was allowed to leave at the end of the interview.

Becker was charged with Possession of a Schedule II Controlled Substance—More than One Gram, in violation of section 18–18–405, C.R.S. (2008), and Obtaining a Controlled Substance by Fraud and Deceit, in violation of section 18–18–415, C.R.S. (2008). Becker filed motions to suppress evidence, physician's statements, and his own statements. The trial court denied the motions to suppress evidence and physician's statements, but granted the motion to suppress Becker's statements, finding that the statements were given in response to custodial interrogation conducted without first advising him of his *Miranda* rights. The People appealed.

## II. Analysis

The prosecution may not use against a defendant any statements he made during the course of custodial interrogation unless the defendant was given the requisite warnings. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The fact that DeFusco's questioning constituted interrogation is not disputed in this case. We turn, then, to whether the defendant was "in custody." *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) ("*Miranda* warnings are required only when there has been such a restriction on a person's freedom as to render him 'in custody.'").

We review a trial court's custody determination de novo. *People v. Matheny*, 46 P.3d 453, 459 (Colo.2002). We laid out the formal test for custody determinations in *Matheny*: we must objectively determine "whether a reasonable person in the suspect's position would believe himself to be deprived of his freedom of action to the degree associated with a formal arrest." *Id.* at 467. *See also People v. Stephenson*, 159 P.3d 617, 620 (Colo.2007) ("The touchstone of custody is significant curtailment of the defendant's freedom of action that is equivalent

to formal arrest."). Factors to be considered include:

> (1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the officer to the defendant; (4) the officer's tone of voice and general demeanor; (5) the length and mood of the interrogation; (6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; (7) the officer's response to any questions asked by the defendant; (8) whether directions were given to the defendant during the interrogation; and (9) the defendant's verbal or nonverbal response to such directions.

*Matheny*, 46 P.3d at 465–66 (quoting *People v. Trujillo*, 938 P.2d 117, 124 (Colo.1997)). No single factor is determinative, and the totality of the circumstances must be considered. *People v. Dracon*, 884 P.2d 712, 717 (Colo.1994).

The present case can easily be analogized to our *Matheny* decision. There, the suspect was confronted at his place of employment and "asked, not told" to come down to the police station to discuss an ongoing investigation. *Matheny*, 46 P.3d at 467. His mother met him at the station, where he was told that he was not under arrest and could leave at any time. *Id.* The suspect then proceeded, in a narrative fashion, to explain to investigators what happened on the night in question. *Id.* Throughout the interrogation, investigators "were completely honest" with the suspect and "did nothing other than encourage him to tell the truth and warn him of the consequences of lying." *Id.* The investigators spoke with soft voices, were polite, gave the suspect no directions, and placed no restraint upon him. *Id.* We concluded that the suspect was not in custody until he was arrested, although investigators intended to persuade the suspect to admit that he was involved in the crime. *Id.*

The interrogation that took place here is similar to that in *Matheny*. Becker was asked, not told, to accompany DeFusco to the employee lounge to discuss his involvement with the forged prescription. DeFusco testi-

fied that he informed Becker that he was not under arrest.[1] The tone of the conversation remained civil throughout.[2] DeFusco was honest with Becker, encouraging him to tell the truth in order to avoid jail time. Becker's story about forging the prescription in the hospital was told in narrative fashion. No restraints were ever used, and DeFusco's weapon was concealed the entire time. The lounge did not have a door, and DeFusco moved around the room during the interview, facing the entryway in an effort to avoid the appearance that Becker was not free to leave.

We conclude that an objective person in Becker's position would not have found the restriction on his freedom of action equivalent to a formal arrest. *Cf. People v. Minjarez*, 81 P.3d 348, 356–57 (Colo.2003) (holding that defendant was in custody because "police create[d] an atmosphere equivalent to that of formal arrest" when two officers questioned the defendant in a hospital room after directing him to sit in the chair furthest from the locked door; stood between the defendant and the door; were dishonest with the defendant; spoke to the defendant in a confrontational tone; and provided all of the details of the incident in question to the defendant, forcing him to agree).

### III. Conclusion

For the foregoing reasons, we hold that Becker was not in custody when he was interrogated by DeFusco. It was therefore error for the trial court to suppress statements Becker made during the interrogation. We reverse the trial court's suppression order and remand for further proceedings.

Justice MARTINEZ dissents, and Chief Justice MULLARKEY and Justice BENDER join in the dissent.

1. Becker's wife testified that she did not hear DeFusco inform her husband that he was not under arrest. However, DeFusco testified that he did so in this case and that it was always his practice to do so in this type of situation. The trial court resolved this conflicting testimony in favor of DeFusco, finding, "The defendant was advised by Capt. DeFusco that he was not under arrest...."

2. The trial court found that "[t]he mood of interrogation, although civil, was directed at obtain-

Justice MARTINEZ, dissenting:

I do not agree with the majority's conclusion that Becker, who was told he was being detained, moved to a secluded location, and escorted through the store, was not in custody. Instead, I agree with the trial court that a reasonable person in Becker's position would believe his freedom of action restricted to a degree associated with formal arrest. Therefore, I respectfully dissent from the majority's decision.

Immediately after watching Becker receive the filled prescription from the pharmacist, Detective DeFusco approached Becker, produced his badge and seized the prescription by removing it from Becker's hands. DeFusco informed Becker that, while not under arrest, he was "being detained for investigation."[1] The majority does not even mention the fact that Becker was specifically told he was "detained"; however, this statement is highly significant because it explicitly informed Becker that he was *not* free to conclude the questioning and leave the pharmacy.

After seizing the prescription, DeFusco stated he and Becker "needed to talk" about an allegedly altered prescription. DeFusco then moved Becker to a semi-secluded employee lounge area not open to the public. When store employees entered the lounge area, DeFusco asked them to leave. After a brief discussion in the lounge, DeFusco escorted Becker back into the store to locate Becker's wife. During the time they were outside of the employee lounge, DeFusco remained with Becker. DeFusco then escorted Becker and his wife back to the lounge area and commenced the interrogation.

*Miranda* warnings must be administered any time an individual is subjected to custo-

ing an admission from the defendant." However, we have made clear that, "persuasion is not coercion," and the fact that the purpose of an interview is to persuade a suspect to admit involvement in a crime does not automatically render the interview custodial. *Matheny*, 46 P.3d at 467.

1. The trial court found that Becker was informed he was "detained for investigation." This finding is supported by evidence in the record.

dial interrogation. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). Here, it is not disputed that DeFusco's questioning of Becker constituted interrogation. Therefore, the focus of the analysis is on *Miranda's* custody requirement. "Custodial interrogation" is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. The "ultimate inquiry for determining whether a person is 'in custody' for purposes of receiving *Miranda* protection" is whether "there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983).

In order to determine what circumstances constitute a restraint on freedom "to a degree associated with formal arrest," a court must ask how a "reasonable man in the suspect's position would have understood his situation." *People v. Matheny,* 46 P.3d 453, 464 (Colo.2002) (internal citations omitted). Factors considered when determining whether a reasonable person in the defendant's situation would feel that his freedom of movement is restrained "to a degree associated with formal arrest" focus on the degree of authority and control the police officer exerted during the questioning.

The majority asserts that under a totality of the circumstances analysis, a reasonable person in Becker's situation would not have found the restriction on his freedom of action to be "equivalent to a formal arrest." They come to this conclusion by analogizing the present situation to that in *Matheny.* There, police had information implicating the involvement of the defendant in several murders. Four officers appeared at the defendant's place of employment and asked if he would accompany them to the police station to "talk." *Id.* at 456. The defendant agreed and drove himself and one of the officers to the police station. *Id.* The defendant's mother arrived approximately twenty minutes after the defendant and the officer reached the

police station. *Id.* Soon after her arrival, the officer conducting the questioning informed the defendant and his mother that "they were free to leave at any time, and defendant was not under arrest." *Id.* at 456–57 (internal quotations omitted). The questioning lasted for an hour and a half and concluded with the officers placing the defendant under arrest. *Id.* at 457.

This court concluded Matheny was not "in custody" for *Miranda* purposes until the police placed him under formal arrest. *Id.* at 467. The factors we used to come to this conclusion were: 1) the defendant was asked, not told, to discuss the investigation; 2) he voluntarily drove himself to the police station for the questioning; 3) once at the station, he was informed he was not under arrest, and was *free to leave at any time. Id.*

The situation in the present case differs significantly from that in *Matheney.* Detective DeFusco did not tell Becker he was free to leave at any time. In fact, while Becker was informed that he was not under arrest, he was explicitly told he was being "detained." By definition, the word "detain" means that a person is not free to leave at any time. *Merriam–Webster* defines "detain" as "to hold or keep as in custody" and "to restrain, especially from proceeding." *Merriam–Webster's Collegiate Dictionary,* 340 (11th Ed.2003). The *Oxford English Dictionary* defines "detain" as "to keep from proceeding; delay" and alternatively as to "keep in official custody." *Compact Edition of the Oxford English Dictionary,* 703 (6th Ed.1973). Therefore, based on ordinary usage, when an individual is informed by a police officer that he is being "detained," a reasonable person necessarily believes that he is *not* free to leave the premises and disregard a request to answer the officer's questions.

Here, when DeFusco approached Becker, removed the prescription from his hands, informed him that he was being "detained," led him to the employee lounge, and maintained a close physical distance between himself and Becker, this amounted to a significant show of authority on DeFusco's part. When told that he is being "detained," a reasonable person would conclude that he

must comply with the officer's requests until released from the "detention."

In circumstances different from Becker's, courts have found that individuals were not in custody for *Miranda* purposes when they were briefly detained by police officers during routine traffic stops or voluntarily went to police stations for questioning. In the vehicle stop context, a short detention of the vehicle's occupants does not amount to custody under *Miranda;* however, the present situation is vastly different. When police officers stop a vehicle and "detain" the driver and passengers, there is an expectation on the part of the occupants that the detention will be brief and last only so long as is necessary for the traffic issue to be resolved. *See People v. Cervantes–Arredondo,* 17 P.3d 141, 147 (Colo.2001). This may involve a brief investigation into the vehicle's registration, driver's license status, prior traffic violations, or outstanding citations or warrants.

Because this kind of short detention is expected by the occupants of the vehicle, and necessary to resolution of traffic infractions, a show of authority on the part of the police may be tolerated without a reasonable person feeling that this restraint on movement is to a degree associated with formal arrest. Therefore, during traffic stops, the vehicle occupants are not "in custody" for *Miranda* purposes.

Similarly, in voluntary station house questionings, a defendant agrees to go to that particular location. Even if the defendant is accompanied there by police officers, or the questioning occurs in an access-restricted area, the defendant is not in custody because he could elect to leave at any time.

Finally, the analysis and conclusion of the majority implies that if an individual "detained" for questioning is not formally arrested at the conclusion of the questioning, that "detention" does not amount to custody for *Miranda* purposes. The majority emphasizes that an individual is only in custody when his freedom of movement is restricted in a manner "equivalent to formal arrest," and ignores that Becker was told he was detained. The majority thereby incorrectly asserts that an arrest, or its equivalent, is required for a finding of *Miranda* custody.

However, the proper inquiry instead looks more to whether a reasonable person would feel restrained to a degree *associated* with formal arrest. Accordingly, the focus of the analysis is not the end result of arrest, but rather the level of restraint a reasonable person would feel during the police interrogation. In the circumstances here, which are not those of a traffic stop, a reasonable person would understand he was detained, not free to end the detention, and subject to interrogation. The majority fails to explain how a reasonable person would perceive this detention as differing from the restraint of formal arrest.

Because I would affirm the trial court's suppression of Becker's statements made to Detective DeFusco as the product of custodial interrogation without proper *Miranda* warnings, I respectfully dissent from the majority opinion.

I am authorized to state Chief Justice Mullarkey and Justice Bender join in this dissent.